

LAZARE POTTER & GIACOVAS LLP
ROBERT A. GIACOVAS, ESQ.
LAINIE E. COHEN, ESQ.
950 THIRD AVENUE
NEW YORK, NEW YORK 10022
Telephone: (212) 758-9300
Facsimile:  (212) 888-0919

Attorneys for Plaintiff, FRANK OWENS

**08 CIV 8414**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x

FRANK OWENS

                                Plaintiff,

      v.

GAFFKEN & BARRIGER FUND LLC,
G&B PARTNERS, INC., BARRIGER
CAPITAL, LLC, BRIDGEVILLE
MANAGEMENT, LLC, LLOYD VERNON
BARRIGER, and ANDREW MCKEAN,

                            Defendants.

-------------------------------------------------------------------x

CASE NO.:

**COMPLAINT**

**JURY TIAL
DEMANDED**

Plaintiff, FRANK OWENS (hereinafter referred to as "OWENS" or "Plaintiff"),

by and through his counsel, Lazare Potter & Giacovas LLP, as and for his Complaint

against the Defendants, GAFFKEN & BARRIGER FUND, LLC, G&B PARTNERS,

INC., BARRIGER CAPITAL, LLC, BRIDGEVILLE MANAGEMENT, LLC, LLOYD

VERNON BARRIGER, and ANDREW MCKEAN (hereinafter referred to collectively as

"Defendants"), respectfully alleges as follows:

**PARTIES**

1.      Plaintiff FRANK OWENS is an adult individual with a residential address at 4585 State Route 97, Narrowsburg, New York 12764.

2.      Defendant GAFFKEN & BARRIGER FUND, LLC, (hereinafter the "FUND") is a domestic limited liability company formed under the laws of the State of New York, to hold primarily real estate collateralized commercial mortgage loans and other mortgage, real estate related and non-real estate assets (hereinafter the "Portfolio"), and maintains a principal place of business at 198 Bridgeville Road, Monticello, New York, 12701.

3.      Defendant G&B PARTNERS, INC., (hereinafter "G&B") is the Managing Member of the FUND, and incorporated under the laws of the State of New York.  G&B maintains a principal place of business at 198 Bridgeville Road, Monticello, New York, 12701.

4.      Defendant BARRIGER CAPITAL, LLC, (hereinafter "BARRIGER CAPITAL") is a domestic limited liability company formed under the laws of the State of New York, and the servicer of the FUND'S loans, earning a fixed fee of $30,000 monthly for its services. BARRIGER CAPITAL maintains a principal place of business at 198 Bridgeville Road, Monticello, New York, 12701.

5.      Defendant BRIDGEVILLE MANAGEMENT, LLC, (hereinafter "BRIDGEVILLE") is a domestic limited liability company formed under the laws of the State of New York, and the investment manager of the Portfolio, earning a monthly fee equal to .1250% of the ending net asset value of assets under its management. BRIDGEVILLE maintains a principal place of business at 198 Bridgeville Road, Monticello, New York, 12701.

2

6.      Defendant LLOYD VERNON BARRIGER (hereinafter "BARRIGER") is an individual adult who upon information and belief, resides in Sullivan County, New York with a principal place of business at 198 Bridgeville Road, Monticello, New York, 12701. At all times mentioned herein, Defendant BARRIGER was principal shareholder, director and officer of G&B; sole member of BRIDGEVILLE; and part owner of BARRIGER CAPITAL. BARRIGER is the final decision-maker, and sets policy for the FUND.

7.      At all times mentioned herein, Defendant LLOYD BARRIGER acted within the course and scope of his employment with the FUND, G&B, BRIDGEVILLE and BARRIGER CAPITAL, and their supervisors and control persons knew or should have known that the acts and/or omissions alleged herein were committed by him.

8.      Defendant ANDREW MCKEAN (hereinafter "MCKEAN") is an individual adult, who on information and belief resides at 16 Nearing Lane, Bethel, New York, in Sullivan County with a principal place of business at 198 Bridgeville Road, Monticello, New York, 12701. At all times mentioned herein, MCKEAN was employed by BARRIGER CAPITAL as president and chief executive officer. MCKEAN was also part owner of BARRIGER CAPITAL and vice president of the Managing Member, G&B.

9.      At all times mentioned herein, Defendant MCKEAN acted within the course and scope of his employment with BARRIGER CAPITAL and G&B, and their supervisors and control persons knew or should have known that the acts and/or omissions alleged herein were committed by him.

## JURISDICTION

10.      Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), as Plaintiff seeks damages for, among other things, a breach of the

3

federal securities laws, specifically violation of the U.S. Securities and Exchange Act of 1934. All other claims alleged herein are properly before this Court pursuant to 28 U.S.C. § 1367 (supplemental jurisdiction) as those claims form part of the same case or controversy as those brought under federal law.

## VENUE

11.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) since a substantial part of the events or omissions giving rise to the claims of Plaintiff occurred in this district, and all parties are subject to personal jurisdiction in this district.

## NATURE OF THE CASE

12.     This action seeks both compensatory and punitive damages for the fraud perpetuated upon Plaintiff by Defendants. After making the decision to retire after 27 years as a fashion photographer, Plaintiff sold a building he owned, planning to use the proceeds to support himself and his family. With absolutely no prior investment experience, Plaintiff took $2 million of his irreplaceable retirement monies to a broker in the local community, Defendant, BARRIGER. In his one and only meeting with BARRIGER and Defendant MCKEAN, Plaintiff was told that they would invest his money in a safe, conservative, highly liquid investment, something "like a money market account," with a "*personally guaranteed* 8% return."

13.     Unbeknownst to Plaintiff, the safe, conservative liquid investment turned out to be a highly leveraged real estate FUND dedicated to lending money to high-risk borrowers – in essence, an investment in the sub-prime mortgage market at a time when the risks of investing in the real estate market were already well known.

14.     Not only did Defendants take Plaintiff's money under false pretenses, but they also failed to disclose that they were intimately connected with the FUND in which they supposedly invested his money, and were in fact being paid by the FUND for their

services on its behalf.  BARRIGER and MCKEAN failed to disclose that all of the Defendants were benefiting financially from Plaintiff's investment, and it was Defendants' interests they were looking out for, not Plaintiff's.

## STATEMENT OF FACTS

15.     Plaintiff, who is now 60 years old and retired, made his living as a fashion photographer in New York City.  OWENS had been in the photography business for 27 years, and worked out of a building he had purchased in mid-town Manhattan in 1978 that housed his studio.  In or about May 2007, after making the decision to retire, OWENS sold the Manhattan property for a total of $6 million.

16.     Throughout his working life, OWENS had absolutely no experience with investing money.  Other than owning his family home and the Manhattan property, OWENS had no investments.  He did not have a brokerage account; he didn't own any stocks or bonds; he didn't know what to do with his money, or even with whom to discuss such matters.

17.     When he sold his Manhattan property, OWENS received approximately $4.2 million.  Of this amount, Owens was told that he would need to pay the as yet to be assessed capital gains taxes.  Owens had already earmarked a significant portion of these monies (approximately $1.6 million) to put in a money market fund at Catskill Hudson Bank that would pay him 5%, but had no idea as to what investment vehicle would best suit his needs.  Upon the recommendation of his long-time legal advisor, Owens made an appointment with BARRIGER to discuss his options.  BARRIGER was purported to be a founding director of the Community Bank of Sullivan County, and a well-respected member of the community.

18.     OWENS met with BARRIGER on September 26, 2007, at the offices of Barriger & Barriger, Inc., a registered securities broker-dealer (hereinafter "B & B").

OWENS explained that he was seeking a safe, low-risk investment which would provide him and his family a regular stream of income, as he had two daughters, one already in college and one on her way, to support. OWENS also explained that he would need the ability to withdraw funds when necessary, as he would eventually need to pay the capital gains taxes on the sale of the Manhattan property. OWENS also informed BARRIGER that he had intended to put a large sum (approximately $1.6 million) into a money market account.

19.     During this one and only meeting, BARRIGER began by discussing the attributes of a diversified portfolio. However, BARRIGER then indicated some concern regarding the unnecessary expense that moving money in and out of stocks would generate in light of the as yet undetermined capital gains obligation. BARRIGER then suggested that in the interim, OWENS temporarily move his money into the FUND. BARRIGER suggested that once the amount of the tax had been determined and paid, transferring the funds into a diversified portfolio would then be the way to go, given OWEN'S financial situation.

20.     BARRIGER explained that the FUND, which had been in existence for approximately ten years, was very successful, with nearly $50,000,000 in holdings. BARRIGER told OWENS the FUND paid a *personally guaranteed* minimum return of 8% (which was 3% more than the money market that Owens was to open), along with the same personal guarantee on the principal. OWENS asked about the possibility of streaming the interest distributions directly into his checking account and BARRIGER assured him that this would not be a problem.

21.     OWENS then asked if he would be able to easily reach the principal if there was ever a need for it. BARRIGER explained that if OWENS needed $500,000 to $1,000,000, he could access those funds within twenty-four hours with no difficulty. If OWENS needed to withdraw the entire balance, he would have a check in his hands in

less than forty-eight hours.  BARRIGER explained that he could *personally guarantee* the money would be available, due to a loan loss reserve maintained on the FUND.

22.     During this meeting, BARRIGER introduced OWENS to his colleague, MCKEAN, who then joined their meeting.  MCKEAN further reassured OWENS that his investment would be safe, reachable and productive for the short-term if he invested in the FUND as BARRIGER had advised.  In fact, MCKEAN parroted every assurance BARRIGER had advanced previously.

23.     Based upon the assurances given by both BARRIGER and his colleague MCKEAN, and because BARRIGER had been recommended by his long-time legal advisor as a highly knowledgeable, well-known member of the community, OWENS believed he was in the right hands; that his investment would be sound and that the assurances he had been given were actually true.  And though he was given nothing in writing, and nothing to sign, OWENS left the offices of B & B trusting and believing that BARRIGER would take care of his investment.  The very next day, September 27, 2007, he instructed his attorney to send $2 million dollars to the FUND.  On information and belief, the investment was made by a debit memo which transferred monies from OWENS' attorney escrow account to an account for the FUND at the same bank.

24.     During this meeting, OWENS was never told of BARRIGER'S ties to the FUND, to its' Managing Member G&B, to its Investment Manager BRIDGEVILLE, or to the FUND'S servicer BARRIGER CAPITAL.  OWENS was not informed that when BARRIGER advised him to invest his retirement funds in the FUND, that BARRIGER was not speaking to OWENS as his broker and investment advisor; with OWENS' best interests in mind, as he should have; but BARRIGER was speaking on behalf of the FUND, G&B, BARRIGER CAPITAL, and BRIDGEVILLE, and with only the FUND, G&B, BARRIGER CAPITAL, BRIDGEVILLE and his own interests in mind.

25.     Nor was OWENS ever told that MCKEAN did not actually work for B &
B, but was in fact a principal, along with BARRIGER in G&B and BARRIGER
CAPITAL; and was actually speaking to OWENS on behalf of the FUND, G&B and
BARRIGER CAPITAL, and with only the FUND, G&B, BARRIGER CAPITAL and his
own interests in mind.

26.     Nonetheless, on or about October 1, 2007, OWENS received his first
written communication from BARRIGER and MCKEAN in which they reiterated the
very same guarantees regarding the FUND'S security.  The October 1, letter stated: "we
personally guaranteed the principal and a floor minimum return of 8%;" partners wanted
and would receive "no fluctuation in the value of your investment;" and "a decent return
on your investment."   In comparing the FUND to other investments, the letter states:
"you must compare factors like the lack of fluctuation in value (stability), quick access to
money (liquidity), and the relative safety of any investment in order to make such
comparisons" and concludes that "[b]ased on [their] experience," the FUND "compares
favorably with many."  The letter also included a quarterly statement reflecting OWENS'
growing balance and accrued interest.

27.     OWENS received a second quarterly statement in January 2008, again
showing a growing principal balance and accrued interest, and a letter from BARRIGER,
indicating that 2007 had been a difficult year.  The letter, dated December 31, 2007,
nonetheless reassured investors that "despite the difficult environment," they had
continued, as promised, to pay the guaranteed 8% return, and to maintain principal
balances – "[t]hose two items remain our priorities."   The letter further informed
investors that there had been "a substantial amount of new money added to the FUND'S
capital" in 2007.  Based on BARRIGER'S optimism, OWENS believed that everything
was going as planned with his investment.

28.    However, on March 5, 2008, OWENS received a letter from BARRIGER informing him that, quite suddenly, access to OWENS' entire investment had been frozen.   The *"personally guaranteed* 8% return" on his investment was being discontinued -- indefinitely.   OWENS' supposedly safe, liquid, investment was now completely illiquid.

29.    In the March 5, letter, OWENS learned, *for the first time,* that:
- the bulk of the FUND'S portfolio was comprised of commercial real estate loans;
- the FUND was in debt;
- Repayment speed on the loans had slowed;
- the value of the FUND'S real estate collateral had dropped;
- the FUND was not receiving payment on many of the loans and was foreclosing on properties and re-selling them in order to collect the outstanding debt at a  time when the real estate market was slow;
- cash inflow was declining and outflow of expenses to run the business was increasing;
- any inflow of cash would from then on be used to pay down the FUND'S debt;
- the "global credit crunch" had "clobbered [the FUND] over the head, and hard."

30.    Some or all of the Defendants knew or should have known of the myriad problems (first disclosed in March of 2008) at the time they solicited OWENS' investment in the FUND.   On information and belief, OWENS' $2 million investment was, in fact, solicited at a time that the Fund was already experiencing financial difficulties.

31.    Shocked at the information he had received, OWENS immediately called BARRIGER.  Forced to confirm that the FUND was something altogether different than what OWENS had been led to believe, BARRIGER'S only response was that he "didn't see it coming."   When reminded about their meeting and of his assurances that this was a virtually risk-free investment, *personally guaranteed* by BARRIGER and MCKEAN, BARRIGER had no response.

32.    OWENS asked BARRIGER why this high level of risk, the huge potential for loss, the very nature of the investment weren't discussed at their meeting.    In response, BARRIGER claimed that it was all covered in the Private Placement Memorandum ("Memorandum") Amended and Restated Limited Liability Company Agreement and Subscription Agreement (together referred to as the "Agreements"). BARRIGER also asserted that OWENS signed these documents at his office during that meeting.    OWENS reminded BARRIGER that he had not been provided with a Memorandum, and in fact didn't even know what such a document was, nor did he see or sign any such Agreements.  BARRIGER indicated he would look for the signature pages and forward copies to OWENS.

33.    At this point, OWENS went back to his attorney.  He asked him, given his long-term relationship with BARRIGER, to intercede on his behalf.  Mr. Baum contacted B & B and requested a copy of OWENS' file.

34.    By letter dated March 11, 2008, Mr. Baum received a copy of the file along with a copy of the Memorandum and the Agreements, both unsigned.  In the cover letter, BARRIGER admits that they had "either misplaced the signature pages or did not receive them from OWENS."  Incredibly, despite all of their misrepresentations and the fact that OWENS' entire investment was in jeopardy, BARRIGER's letter asks Mr. Baum to have OWENS sign and return the Agreements.

35.    Contained in OWENS' file, was a letter from MCKEAN, Vice President of the FUND, dated September 26, 2007, and enclosing for OWENS' signature, a Subscription Agreement and a copy of a Private Placement Memorandum dated January 1, 2007.  BARRIGER maintained that this letter had been mailed to OWENS on or about September 26, 2007.

36.    Plaintiff never received, reviewed or signed any document prior to his investment and never received or signed any Subcription Agreement.  Instead, OWENS,

at the direction of Defendants, instructed his attorney to wire his $2 million to BARRIGER on September 27, 2007.    Had OWENS known the true nature of the investment, he would never have invested in the FUND.

37.    The terms of the Amended and Restated Limited Liability Company Agreement dated January 1, 2007, specifically provide in part:

- "10.4 Admission of Additional Members; Additional Units: (b) The admission of a Person as an additional Member shall be effective only upon the execution by such Person of a counterpart of this Agreement, the notation of the additional Member's address, Capital Contribution and number of Units on Schedule A and the payment of the additional Member's Capital Contribution to the Company."

38.    Though OWENS has never signed the "Agreement" authorizing his investment in the FUND, Defendants have converted his $2 million and despite OWENS' demand for the return of his money, BARRIGER continues to assert that OWENS (i) is a member of the FUND, (ii) will not be treated any differently than any other member, and (iii) money will not be returned or released under any circumstances.

## AS AND FOR A FIRST CAUSE OF ACTION
## VIOLATION OF THE SECURITIES AND EXCHANGE ACT OF 1934
### (Against All Defendants)

39.    Plaintiff repeats and realleges paragraphs 1 through 38 set forth above as if fully set forth herein.

40.    In the manner alleged above, Defendants, in connection with the offer and sale of securities, and by use of the United States Mail, and means and instrumentalities of interstate commerce, employed devices, schemes, and artifices to defraud; and engaged in transactions, practices and course of conduct which operated as a fraud and deceit upon Plaintiff.

41.     By virtue of the foregoing, Defendants have violated, as against the rights of Plaintiff, Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. Section 78j(b) and Rule 10b-5 hereunder, 17 C.F.R. Section 240.10b-5, as duly adopted and promulgated by the U.S. Securities and Exchange Commission, and in full force and effect.

42.     G&B, BARRIGER CAPITAL and BRIDGEVILLE were "controlling persons" of BARRIGER and MCKEAN with respect to the sales to Plaintiff, and are jointly and severally liable in respect to such sales under Section 20(a) of the 1934 Act, 15 U.S.C. Section 78t.

43.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff suffered damages in an amount to be proven at trial, but no less than $2,000,000.

## AS AND FOR A SECOND CAUSE OF ACTION
### FRAUDULENT MISREPRESENTATION
### (Against All Defendants)

44.     Plaintiff repeats and realleges paragraphs 1 through 43 set forth above as if fully set forth herein.

45.     Defendants knowingly and recklessly made omissions, representations and/or recommendations that acted as a fraud upon Plaintiff. Defendants knowingly and recklessly omitted to state material facts necessary in order for Plaintiff to properly evaluate, consent to, or decline to consent to the Investment. Such acts include but are not limited to:

A)      Defendants represented to OWENS that the Investment LLOYD intended to put OWENS' money in was a safe, highly liquid investment vehicle suitable for OWENS' particular investing requirements;

12

B)   Defendants failed to disclose to OWENS that the Investment was in fact a highly speculative, extremely risky investment, subject to such severe restrictions on transferability and redemption that OWENS would have absolutely no control over his money, and one in which only investors who were prepared to lose their entire investment should consider investing;

C)   Defendants failed to disclose that the Fund was investing heavily in real estate and most notably in the sub-prime mortgage market, which at the time of OWENS' Investment, was already very publicly in crisis and a losing proposition by any investor's standards, prudent or otherwise;

D)   Defendants also failed to disclose that in connection with the solicitation of the Investment, BARRIGER was not only acting as OWENS' broker, but was simultaneously acting on behalf of the FUND as the final decision-maker and policy setter for the FUND; that he was principal shareholder, director and officer of G&B, the Managing Member of the FUND; that he was sole member of BRIDGEVILLE, the FUND'S investing manager, and was receiving a monthly fee of .1250% of the ending net asset value of the assets in the FUND for his role as such;  and that he was a co-owner of BARRIGER CAPITAL, the FUND'S servicer, which earned a fixed monthly income of $30,000 for its services to the FUND;

E)   Defendants also failed to disclose that in connection with the solicitation of the Investment, MCKEAN was not a registered broker, nor was he in any way connected with B & B; that he was vice president of G&B, the Managing Member of the FUND; and that he was president, CEO and a

13

co-owner of BARRIGER CAPITAL, the FUND'S servicer, which earned a fixed monthly income of $30,000 for its services to the FUND;

F)   Defendants invested OWENS' money in the FUND without his approval, and without his required signature. Moreover, Defendants attempted to cover their tracks by insisting that OWENS sign the required documentation six months after the fact, and after OWENS had been informed his Investment had been frozen.

46.   At all times relevant, Defendants intended that Plaintiff would act upon their misrepresentations and/or omissions and would invest his money in the FUND, as such an Investment would increase Defendants' profits and/or commissions, at the expense of, and to the financial detriment of Plaintiff.

47.   As a result of Defendants' fraudulent acts and/or omissions, Plaintiff did suffer financial damages, in an amount to be proven at trial, but no less than $2,000,000.

48.   Punitive damages are appropriate in this case to punish Defendants for their misconduct and treatment of Plaintiff who trusted and relied upon Defendants to look out for his best interests. Plaintiff has suffered by Defendants' actions and/or inactions, by their misrepresentations, their fraudulent acts and/or omissions, and by their shirking of their duties to Plaintiff. Plaintiff thus contends that punitive damages are warranted to punish Defendants and to set a concrete example for others, and to send a message that such outrageous conduct will not be tolerated.

## AS AND FOR A THIRD CAUSE OF ACTION
### NEGLIGENT MISREPRESENTATION
#### (Against All Defendants )

49.   Plaintiff repeats and realleges paragraphs 1 through 48 set forth above as if fully set forth herein.

50.     At a minimum, Defendants failed in their mandated duty to Plaintiff by failing to provide Plaintiff with the material facts necessary for him to make an informed decision whether or not to invest in their highly risky, and extremely speculative scheme to invest in the already crashing sub-prime mortgage market.

51.     Throughout the solicitation and life of Plaintiff's Investment in the FUND, Defendants breached their duty to Plaintiff by failing to provide proper, sincere, truthful and accurate advice, as well as material information that was readily available to them, but not to Plaintiff.   They failed to ensure that Plaintiff understood the high risk and speculation inherent in the purchase of the securities bought.   They failed to secure Plaintiff's signature on the very documents that would have apprised Plaintiff of the true nature of the Investment.   Plaintiff's financial security and safety bore the full brunt of Defendants' negligence.

52.     As a result of Defendants' negligence, Plaintiff suffered financial damages to be proven at trial, but in an amount no less than $2,000,000.

## AS AND FOR A FOURTH CAUSE OF ACTION
### CONVERSION
#### (Against All Defendants)

53.     Plaintiff repeats and realleges paragraphs 1 through 52 set forth above as if fully set forth herein.

54.     In the manner alleged above, Defendants have wrongfully taken Plaintiff's two million dollar interest in the FUND.

55.     Plaintiff has requested that his funds be returned to him to no avail. Defendants have refused and continue to refuse to return Plaintiff's investment to him. Defendants therefore hold Plaintiff's investment funds to his exclusion and in contravention to his rights as the sole and rightful owner of said investment funds.

56.     Plaintiff therefore seeks return of his personal property, specifically his $2,000,000 in retirement funds used by Defendants to purchase an interest in the FUND.

## AS AND FOR A FIFTH CAUSE OF ACTION
### UNJUST ENRICHMENT/QUASI-CONTRACT
### (Against All Defendants)

57.     Plaintiff repeats and realleges paragraphs 1 through 56 set forth above as if fully set forth herein.

58.     In the manner alleged above, Defendants fraudulently induced Plaintiff to part with his money and wire two million dollars to the FUND, without providing him with a copy of the Private Placement Memorandum to review and without signing the Agreements as specifically required by the terms of said Agreements and Memorandum. As such, no agreement exists between Defendants and Plaintiff, and Plaintiff is without an adequate contractual remedy as a result.

59.     By fraudulently inducing Plaintiff to part with his money, Defendants are now in possession of money that in equity and good conscience, they ought not to retain and that belongs to Plaintiff, and Defendants should be required to make restitution to Plaintiff in the amount of $2,000,000.

## AS AND FOR A SIXTH CAUSE OF ACTION
### BREACH OF FIDUCIARY DUTY
### (Against All Defendants)

60.     Plaintiff repeats and realleges paragraphs 1 through 59 set forth above as if fully set forth herein.

61.     At all times mentioned herein, there existed between Defendants and Plaintiff a fiduciary relationship, which arose from the Defendants serving as the Managing Member of the FUND and as its principals; as the final decision-maker and

sole policy setter for the FUND; as the investment manager of the FUND and as its principals; and as the servicer of the FUND'S loans and as its principals. The fiduciary duty mandates honest, fair dealing and a duty to exercise utmost care in making recommendations and in the giving of advice. Moreover, there is a fiduciary duty owed by and between members of a limited liability company and those that act on the company's behalf.

62.    Plaintiff came to BARRIGER through the recommendation of his long-time legal advisor. BARRIGER was recommended as a pillar of the community and a trustworthy financial advisor. Because of this recommendation, OWENS trusted BARRIGER'S judgment and skill as a financial advisor, and gave him $2,000,000 to invest in what he had been told was a safe, low-risk, fully liquid investment.

63.    Defendants breached their fiduciary duty to Plaintiff when they failed to provide Plaintiff with accurate and complete information regarding the true risks and illiquidity of the FUND, as well as their conflicts of interest, and encouraged him to invest in an entirely inappropriate and unsuitable investment for their own financial gain.

64.    As a result of Defendants breach of their fiduciary duties to Plaintiff, Plaintiff did in fact listen to and follow their advice and allowed Defendants to invest his money in the FUND, resulting in financial damages to be proven at trial, but in an amount no less than $2,000,000.

65.    Punitive damages are appropriate in this case to punish Defendants for their misconduct and treatment of Plaintiff who trusted and relied upon Defendants to look out for his best interests. Plaintiff has suffered by Defendants' actions and/or inactions, by their misrepresentations, their fraudulent acts and/or omissions, by their double-dealing, and by their shirking of their duties to Plaintiff, both as an investor and as a purported member of the FUND. Plaintiff thus contends that punitive damages are

warranted to punish Defendants and to set a concrete example for others and to send a message that such outrageous conduct will not be tolerated.

## AS AND FOR A SEVENTH CAUSE OF ACTION
### CONSTRUCTIVE TRUST
### (Against All Defendants)

66.     Plaintiff repeats and realleges paragraphs 1 through 65 set forth above as if fully set forth herein.

67.     In the manner alleged above, Defendants owed Plaintiff a fiduciary duty to exercise utmost care in making recommendations and in the giving of advice, as well as the fiduciary duty owed by each member of a Limited Liability Company to its other members.

68.     In reliance on that fiduciary duty and the advice and recommendation given to Plaintiff by Defendants, Plaintiff transferred his interest in two million dollars to Defendants for their use.

69.     Defendants breached their fiduciary duty to Plaintiff when they fraudulently misrepresented the nature of the FUND and of Plaintiff's investment therein, as more fully set forth above.

70.     Defendants would be unjustly enriched were they allowed to profit from the breach of their fiduciary duty and keep Plaintiff's two million dollar investment. Therefore, a Constructive Trust should be established in which Defendants shall be required to deposit $2,000,000 for the sole benefit of Plaintiff.

## AS AND FOR AN EIGHTH CAUSE OF ACTION
## VIOLATION OF NEW YORK GENERAL BUSINESS LAW §349
### (Against All Defendants)

71.     Plaintiff repeats and realleges paragraphs 1 through 70 set forth above as if fully set forth herein.

72.     In the manner alleged above, in connection with the solicitation and offer of sale of an interest in the FUND to Plaintiff, Defendants utilized unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of their business.

73.     By virtue of the foregoing, Defendants have violated New York's Deceptive and Unfair Trade Practices Act, as set forth in New York Gen. Bus. Law § 349, and Defendants are liable for Plaintiff's damages as defined therein, including his reasonable attorneys' fees and costs.

## AS AND FOR A NINTH CAUSE OF ACTION
## BREACH OF CONTRACT/BREACH OF IMPLIED
## COVENANT OF GOOD FAITH & FAIR DEALING
### (Against All Defendants)

74.     Plaintiff repeats and realleges paragraphs 1 through 73 set forth above as if fully set forth herein.

75.     Defendants have asserted in their dealings with Plaintiff that although he never signed the Agreements, he is a Member of the FUND and is therefore bound by the terms of the FUND'S Operating Agreement.  If it should be determined that Plaintiff is bound thereunder, then so are Defendants.

76.     Defendants, by defrauding and deceiving Plaintiff, failed to observe high standards of commercial honor and just and equitable principles of trade, thereby

breaching their agreement with Plaintiff as an alleged member of the FUND, as well as breaching the implied covenant of good faith and fair dealing inherent in every contract.

77.   As an actual and proximate result of the aforementioned, Plaintiff was damaged in an amount to be proven at arbitration, but no less than $2,000,000.   In addition, Plaintiff is entitled to punitive damages as a result of Defendants' breach of the covenant of good faith and fair dealing inherent in every contract.

78.   If it should be determined that Plaintiff is bound under the terms of the Agreements, then Plaintiff is further entitled to his reasonable attorney's fees pursuant to the Attorneys' Fees Clause contained in the Operating Agreement Defendants allege Plaintiff signed and is bound by, which provides as follows:

> 14.9 <u>Attorneys' Fees</u>.  If any proceeding is brought by one Member against one or more of the other Members or is brought by the Company against one or more Members to enforce, or for breach of, any of the provisions in this Agreement, the prevailing party or parties shall be entitled in such proceeding to recover reasonable attorneys' fees together with the costs of such proceeding therein incurred.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff FRANK OWENS respectfully requests that this Court enter judgment in his favor and against all Defendants, jointly and severally, as follows:

1.   For compensatory damages of not less than $2,000,000, which represents net out-of-pocket losses in Plaintiff's Investment;

2.   For the lost opportunity or reasonable rate of return on the sums invested by Plaintiff consistent with the rate of return on securities which would have been suitable for this Plaintiff;

3.   In the alternative, restitution in the amount of $2,000,000;

4.      In the alternative, return of Plaintiff's personal property, namely his $2,000,000 in retirement funds wrongfully used to purchase an interest in the FUND;

5.      In the alternative, establishment of a Constructive Trust in which Defendants shall deposit $2,000,000 for the sole benefit of Plaintiff;

6.      Disgorgement of commissions and fees in an amount demonstrated and proved at trial;

7.      Punitive damages in an amount to justifiably and equitably punish Defendants;

8.      Interest at the legal rate of 9% from the date Plaintiff invested his funds until any jury award rendered herein is fully paid;

9.      Plaintiff's reasonable attorneys' fees and costs incurred.

Dated: October 1, 2008
New York, New York

LAZARE POTTER & GIACOVAS LLP

By:

Robert A. Giacovas
A member of the firm
Lainie E. Cohen
950 Third Avenue
New York, New York  10022
Telephone (212) 758-9300
Facsimile:  (212) 888-0919
Attorneys for Plaintiff, Frank Owens