LAZARE POTTER & GIACOVAS LLP
ROBERT A. GIACOVAS, ESQ.
LAINIE E. COHEN, ESQ.
950 THIRD AVENUE
NEW YORK, NEW YORK 10022
Telephone: (212) 758-9300
Facsimile:  (212) 888-0919

Attorneys for Plaintiff, FRANK OWENS

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------x

2008-CV-8414

FRANK OWENS

               Plaintiff,

     v.

GAFFKEN & BARRIGER FUND LLC,
G&B PARTNERS, INC., BARRIGER
CAPITAL, LLC, BRIDGEVILLE
MANAGEMENT, LLC, LLOYD VERNON
BARRIGER, and ANDREW MCKEAN,

               Defendants.

------------------------------------------------------------------------x

2008-CV-9357

MARTHA GRAHAM, MARIA GRIMALDI,
LLOYD HELLER, PAULA MANZOLILLO
AND CREAMTON MAPLE TRUST F/B/O
CARL MILLS,

               Plaintiffs,

     v.

LLOYD V. BARRIGER, THE ESTATE OF ANDREW
MCKEAN, LINDA BARRIGER; THE GAFFKEN
& BARRIGER FUND LLC, G&B PARTNERS, INC.,
BARRIGER & BARRIGER INC., BARRIGER
CAPITAL, INC., GITLIN & ASSOCIATES, LLP, and
JOHN DOE,

Defendants.

-----------------------------------------------------------------------x

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF**
**<u>THEIR JOINT MOTION FOR THE APPOINTMENT OF A RECEIVER</u>**

## TABLE OF CONTENTS

I.      Preliminary Statement ……………………………………………4

II.     Statement of Facts ……………………………………………...5

III.    Legal Argument ………………………………………………11

A.      Defendant's Fraudulent Conduct in Palpable in this Case………………12

B.      There is Clearly an Imminent Danger of the Complete Dissipation of
        the Fund's Assets as Insiders Have Been Moved to a Preferred

        Place in Line Ahead of Plaintiffs ……………………………………..13

C.      Legal Remedies as Completely Inadequate to Ensure the Fund Does
        Not Continue to Defraud Plaintiffs ……………………………………..14

D.      Plaintiffs' Harm -- the Complete Loss of Their Retirement Funds –
        Far Outweigh any Potential Harm to Defendants, Especially Given

        Their Agreement With Textron Financial Provides for the

        Appointment of a Receiver ……………………………………………15

E.      Plaintiffs' Probability of Success is High – the Probability That
        They Will Never Recover When They Do Prevail is Even Higher………..16

IV.     Conclusion ……………………………………………………16

Plaintiff, FRANK OWENS (hereinafter referred to as "Mr. Owens"), by and through his counsel of record, Lazare Potter & Giacovas LLP, and Plaintiffs, MARTHA GRAHAM, MARIA GRIMALDI, LLOYD HELLER, PAULA MANZOLILLO AND CREAMTON MAPLE TRUST F/B/O CARL MILLS (hereinafter referred to as "the Graham Plaintiffs") by and through their counsel of record, Ronald Jay Litchman, (hereinafter collectively referred to as "Plaintiffs") and pursuant to Rule 66 of the Federal Rules of Civil Procedure, hereby submit the following Memorandum of Law in support of their Joint Motion for the appointment of a receiver to assume control of Defendant, Gaffken & Barriger Fund, LLC.

## I.
## PRELIMINARY STATEMENT

While the appointment of a receiver is an extraordinary remedy, this is an extraordinary case.  As we detail below, and as the allegations in the separate Complaints filed by plaintiffs make clear, this case involves a massive fraud perpetrated over a period of years that has wiped out the irreplaceable life savings of numerous individuals.  While defendants may deny the allegations of fraud, the documents authored by the defendants contain the best evidence of the fraud —numerous written promises and assurances of *guranteed* investment returns.  Such promise are demonstrably false, as the Fund is now in liquidation.  That liquidation, moreover, is controlled by the same one manager, defendant Lloyd Barriger, who has controlled the fraudulent scheme from its inception. Based upon these facts, the substantial conflicts of interest that exist among the defendants and the self-dealing and mismanagement detailed below, this becomes a textbook case for a receiver.

## II.

## STATEMENT OF FACTS[1]

The following statement of facts will provide the Court with a chronological history of both the Fund's dealings as they are currently known to Plaintiffs, as well as how Plaintiffs fit into those dealings. Shown in this fashion, it becomes glaringly apparent that the Fund and the one person that manages it – Lloyd Barriger – are incapable of overseeing the liquidation of the Fund's assets in any fair and honest manner and the appointment of a receiver is most certainly warranted in this case.

As counsel for the Fund continues to maintain that as a private fund, any financial information is confidential and must not be shared with anyone – even the Fund's own investors – we are limited in our ability to provide the court with a complete chronology of the financial history of the Fund.[2]  We therefore start this chronology where the financial information the Fund has deigned to provide us begins, in April 2007, and end in the same manner, at the end of the first quarter, 2008.

As part of their "confidential" voluntary discovery, Defendants have produced a document entitled "Borrowing Base Certificate History," (Exhibit A.)  The document purports to track, from April 15, 2007 through April 30, 2008, how much money the Fund could borrow under its line of credit with Textron Financial, its principal lender, which was a function of the Fund's net asset value, including the current value of the collateral.  Thus, the "Borrowing Base" measures the Fund's financial health.  When the

---

1 These facts are taken, in part, from the Declarations of Robert A. Giacovas and Ron Jay Litchman both filed herewith; the Complaint filed by Mr. Owens on October 1, 2008, and the Complaint filed by the Graham Plaintiffs on October 30, 2008, both of which are already part of the Court's files, and will not be reproduced again with this motion.  For further detail regarding Plaintiffs' specific allegations against Defendants, we respectfully direct the Court to those documents.  All other referenced exhibits can be found in the Joint Exhibits filed herewith.

[2] As the Court knows, the Defendants have necessitated that this motion be filed "under seal", based upon a confidentiality agreement that was entered into by the parties.  While we will, in accordance with the Court's directive, address the merits of this "confidentiality" by separate letter, we respectfully submit that the Fund's request for blanket confidentiality only underscores the need for a receiver.

value of the collateral was high, the Fund's "borrowing base" increased (the Fund was "healthy"); when the Fund admitted that its collateral had plunged, the "borrowing base" fell with it. (Giacovas Decl. ¶ 7; Litchman Decl. ¶ 10.)

According to the Fund, between April 9 and April 11, 2007, the "borrowing base" dropped from $3,363,786 to $646,239 – a decrease of 80 percent. The "borrowing base" then increased to $2,871,773 on May 3, 2007, but then promptly fell $800,000 by May 7 – a decrease of 27 percent. Two days later, on May 9, 2007, the Fund's "borrowing base" dropped to only $7,421 – a decrease of 99 percent. (Giacovas Decl. ¶ 8; Litchman Decl. ¶ 11.)

Defendants, however, mentioned nothing of this to their investors. Indeed, in a letter dated April 2, 2007 (Exhibit B), Defendant Barriger continued to give investors a rosy picture:

> "Your Fund has furthered its progress on the various fronts we have discussed before; most notable, perhaps, was Textron Financial's raise in the amount of our credit line with them to $20,000,000.  Total assets now exceed $32,000,000. . . ." and "We continue on the same course, working to improve our efficiency and profitability, always keeping in mind the duty we owe you to protect your money while earning a competitive return."

(Giacovas Decl. ¶ 9.)

Starting in or about the same time (i.e. the first quarter of 2007), the Fund became active in issuing promissory notes to a select group of its investors (which Defendants have refused to disclose), who then also became creditors of the Fund.[3] Specifically, in May 2007, account holder 431.56 loaned the Fund $1 million; account holder 430.35 loaned the Fund $1,530,000; and account holder 430.82 injected $1 million into the Fund. (Ex. C.) Notably, the Fund has acknowledged in an (unsigned) August 22, 2008 "Forbearance Agreement" purportedly executed by Textron and the Fund (Exhibit D),

---

[3] The Fund has refused to provide us with the names of these "insider" investors. However, we do know that at least one of these "insiders" is defendant Barriger Capital LLC, an entity that is or was partially owned by defendant Barriger and has now, according to defendants' counsel, ceased operations.

that the issuance of these promissory notes was an "event of default" of the Fund's loan agreement with Textron.  This however, did not stop the Fund from continuing to issue these notes. (Giacovas Decl. ¶ 10.)

In June 2007, Plaintiff Martha Graham, nearing retirement age, invested $30,000, representing the proceeds of the sale of her condominium in Florida, and her entire savings, in the Fund. (Graham Compl. ¶ 139-144.)

In July 2007, account holder 431.56 made another loan to the Fund in the amount of $1 million, and was then repaid $2 million the same month.  Account holder 430.35 was repaid $1,530,000 in July, and then loaned the Fund another $600,000 in August. That same month, the Fund received injections of money from account holder 431.61 in the amount of $500,000, and $1,298,800 from "Campus Capital," which, we have learned, is owned by Barriger, his sister Linda Barriger and Fund accountant, Irwin Gitlin. (Ex. C.)

On Sept. 20, 2007, one of the Fund's largest borrowers, Platinum Properties of Central Florida, the developer of two planned gated communities, filed for bankruptcy protection.  Platinum Properties owed the fund more than $2.2 million.  (Graham Compl. ¶ 40-47; Litchman Decl. ¶ fn 6.)  Though we do not know the exact date, or whether it is related to the bankruptcy, sometime in September 2007, account holder 430.35 loaned the Fund another $1,400,000.  (Ex. C.)

On September 26, 2007, within days of the Platinum Properties bankruptcy, Frank Owens walked into the offices of Barriger & Barriger, Inc., with his $2 million retirement, and knowing nothing about investing in the stock market, sought the aid of Barriger to help him invest his money.  In his one and only meeting with Barriger and defendant Andrew McKean (now deceased), Mr. Owens was told that they would invest his money in a safe, conservative, highly liquid investment, something like a money market account, with a *personally* guaranteed 8% return.  (Giacovas Decl. ¶ 2 -3.)

Without making a single disclosure about where exactly they were going to put Mr. Owens' money, and without getting his signature on the Fund's subscription agreement, as clearly required by both the Private Placement Memorandum ("PPM") (Exhibit E, p. 8, 11), and the Amended and Restated Limited Liability Company Agreement ("the Agreement") (Exhibit F, p. 26), Barriger and McKean took Mr. Owens' life savings, and deposited it in the Fund's bank account. (Giacovas Decl. ¶ 2-3.)

On October 1, 2007, the Fund sent out a letter to all of its investors indicating that the Fund was continuing to make positive progress in a number of key areas. (Ex. G.) What it failed to mention was that it intended to cash out Campus Capital in the amount of $150,000 in equity. (Ex. C.) It did include a "Q & A" which would revisit some of the factors relating to the changes in the Fund's structure. This "Q & A" indicated that the Fund was personally guaranteeing the Fund's principal and a floor minimum return of 8%. (Ex. G.)

In December 2007, upon Barriger's recommendation and assurances of the safety of the investment, Lloyd Heller, who was already heavily invested in the Fund, invested another $40,000. (Graham Compl. ¶ 122.) Plaintiff, Maria Grimaldi was also told by Barriger that the future of the Fund was solid, and based upon his optimistic projections and assurances, she too invested another $4,000 in the Fund at this time. (Graham Compl. ¶ 176.) So too, did Mr. Mills, making a further investment in the Fund during December 2007. On behalf of the Creamton Maple Trust, Mr. Mills entrusted an $11,000 disability payment to Barriger and the Fund. (Graham Compl. ¶ 210-211.) These investments in December 2007, by the Graham Plaintiffs, total $55,000. At the same time, Campus Capital received another equity cash out of $100,000. (Ex. C.)

In January 2008, Plaintiffs all received a letter from the Fund dated December 31, 2007, along with their quarterly statements. In the letter Barriger indicated that the Fund was "cautiously hopeful 2008 will be a more prosperous year [than 2007]." The Fund indicated that the housing asset bubble had begun to affect the entire real estate sector,

and while the Fund was in expansion mode in 2007, it was "now in a batten-down-the-hatches mode."   Even so, Barriger reassured investors that "despite the difficult environment," they had continued, as promised, to pay the guaranteed 8% return, and to maintain principal balances – "[t]hose two items remain our priorities." (Ex. H.)

In January 2008, Mr. Heller invested another $42,000 in the Fund (Graham Compl. ¶ 122); account holder 431.56 was repaid $700,000, and defendant Barriger Capital received a $400,000 loan repayment.   (Ex. C.)

In February 2007, the Fund borrowed another $1,650,000 from account holder 431.56 ($1 million); Campus Capital ($200,000) and Barriger Capital ($400,000). That same month, one month before freezing all of its assets, the Fund repaid account holder 430.35's loan in the amount of $500,000.   The Fund also allowed account holders 430.35 and 431.60 to cash out their *equity* in the amounts of $500,000 and $250,000 respectively. (Ex. C.)

On March 5, 2008, the Fund informed investors that their investments had all been frozen, and the guaranteed 8% return discontinued, indefinitely. (Ex. I.)  Mr. Owens immediately attempted to get his money back, asking Barriger to cash him out, since he wasn't supposed to be in the Fund in the first place.  Barriger informed him that no cash outs, even for hardship, would be allowed.  The Fund was in lock-down.  (Owens Compl. ¶ 31-32.)

On May 30, 2008, the Fund sent another letter to investors, this time informing them that, again, due to this global credit crunch, and the inability of the Fund to sell many of its distressed properties, the Fund was in debt to the tune of $16,248,969. Textron Financial, the secured creditor, was owed $10,138,746, and the remaining $6,110,223 was "owed to *unsecured creditors, including $4,950,000 to lenders who are also Fund partners.*" (Ex. J.)

On July 2, 2008, the news was worse.  The auditors had declined to finish the 2007 year-end audit.  However, this "disappointing news" didn't change management's

assessment of the net asset value for year-end 2007; nor their continuing analysis of the loan portfolio. The Fund intended to approach Textron with an operating plan and budget, whereby Textron would be put in charge of the Fund's purse strings during the liquidation of assets and pay down of the debt to Textron. By doing so, the Fund hoped to enter into a formal agreement with Textron that would ratify its previous unwritten support of the Fund's liquidation. (Ex. K.)

On October 2, 2008, the day after Mr. Owens filed his complaint, the Fund sent another letter, this time informing investors that the Fund had hired an asset liquidation specialist, Fast4ward Capital, LLC. The letter indicated that the Fund was now $14,000,000 in debt to "senior and subordinate creditors, approximately half of that being to Textron." The rest was owed to "other creditors (*previously unsecured*) who have lent money. These lenders are next in line after Textron's loan is repaid." As one of the conditions of Textron's forbearance, these previously unsecured lenders were to sign an agreement not to take action on their loans while Textron's loan was outstanding. Barriger was "hopeful this agreement [would] be forthcoming very soon." (Ex. L.) Despite promises by counsel, and numerous requests for these "agreements," Defendants have still failed to produce them.

According to a Schedule K-1 received by Mr. Owens in November of 2008, his capital account at the end of 2007 – a mere 3 months after his initial $2 million investment – was worth $1,259,163. (Exhibit M).

This is where the information ends. This is of course, because the defendants, in the documents they provided to Plaintiffs voluntarily, do not provide any information beyond the first quarter of 2008. Plaintiffs know nothing about what happened to their investments in calendar 2008 and have received no information or assurances that they will recoup any portion of their investment as a result of the liquidation.

Despite this, counsel for the Fund has maintained (and represented to this Court) that there is "full transparency" as to the Fund's operations because Textron Financial,

Inc. (Textron"), which is the senior secured lender to the Fund, is watching every dollar that is being spent.  Plainly, while Textron may be reviewing the Fund's expenditures to ensure that *it* is repaid, there is no transparency to Plaintiffs, or any of the other investors in the Fund.  Only a receiver can provide neutral, third party oversight of the liquidation of the Fund and provide timely information to ***all*** investors.

### III.
### <u>LEGAL ARGUMENT</u>

While the appointment of a receiver ultimately rests in the sound discretion of the Court based upon the facts and circumstances of each case, there are five factors that are considered relevant to establishing the requisite need for a recceivership: (i) fraudulent conduct on the part of defendant; (ii) the imminent danger of the property being lost, concealed, injured, diminished in value, or squandered; (iii) the inadequacy of the available legal remedies; (iv) the probability that harm to plaintiff by denial of the appointment would be greater than the injury to the parties opposing appointment; and iv) in more general terms, plaintiff's probable success in the action and the possibility of irreparable injury to his interests in the property.  <u>See</u> <u>Wright & Miller, Federal Practice & Procedure</u> (2008), at § 2983 and cases cited therein.

As shown, the Defendants have refused to provide any financial information outside the limited timeframe of April 15, 2007 through April 30, 2008.  They have also refused to disclose the names of insider investors who have been elevated to the level of secured creditors above Plaintiffs and all other investors in the Fund, and they have avoided producing the very agreements that purport to govern this elevation in status. Nonetheless, as we demonstrate below, even the limited evidence before the Court is enough to satisfy the five factors for determining the appointment of a receiver.  Indeed, the facts "present a picture of corporate dishonesty which is, for all its boldness, often quite subtle."  <u>Ferguson v. Tabah</u>, 288 F.2d 665, 676 (2d Cir.1961).

A.    Defendants' Fraudulent Conduct is Palpable in This Case:

The most compelling evidence of defendants' fraudulent conduct is, as noted, contained in the very documents authored by defendants – documents that **guaranteed** a return of 8 percent to all investors in the Fund.  And, in the case of Mr. Owens, the fraud is also evident in the lack of documentation.  Specifically, Barriger took Mr. Owens' money and, without his authority, deposited it into the Fund without a single disclosure, and admittedly, without Mr. Owens' written consent.  The Fund's own controlling documents refuse to recognize a potential investor as a partner in the Fund unless and until that subscription agreement has been signed. (Giacovas Decl. ¶ 2-3; Ex. E, p. 8, 11; Ex. F, p. 26.) This evidence alone satisfies the first factor.

But there is even more compelling evidence of fraud, including that the Fund and Barriger were inducing Plaintiffs (and Mr. Owens) to invest their money at a time when the Fund was in severe financial trouble, and borrowing from some investors to pay off others.  In the case of Mr. Owens, his $2 million investment was made within days of the bankruptcy filing of one of the Fund's largest investors.  (Graham Compl. ¶ 40-47; Litchman Decl. ¶ fn.6.)  Also compelling are the series of pay outs that occurred in the last three months of the Fund's existence before it froze Plaintiffs' investments and refused to make further redemptions.  As the Fund's financial records show, in December 2007, the Fund gave Campus Capital a $100,000 equity redemption.  In January 2007, an undisclosed account holder was repaid $700,000 and defendant Barriger Capital was repaid $400,000.   And in February 2007, on the eve of the Fund's demise, two undisclosed account holders were allowed to redeem a total of $750,000 in equity.  (Ex. C.)  While the identity of account holders are unknown, Campus Capital and Barriger Capital are undeniably insiders.

As the declarations of counsel outline, there are several other potentially fraudulent transactions that call the Fund's ability to monitor itself into serious question, including Campus Capital acquiring a mortgage from the Fund in exchange for a $1.289

million note – a deal that for some undisclosed reason was structured "off the books." (Giacovas Decl. ¶ 29; Litchman Decl. ¶ 21-23; Ex. O)  There is also a lawsuit in which Campus Capital sued the Fund in a mortgage foreclosure action.  (Giacovas Decl. ¶ 30; Litchman Decl. ¶ 25; Ex. P.)  Both of these transactions occurred between interested parties and Fund insiders without any disclosure whatsoever.

In sum, and even without the benefit of any formal discovery, there is sufficient evidence of fraud to support the appointment of a receiver.

B.   There is Clearly An Imminent Danger of the Complete Dissipation of the Fund's Assets As Insiders Have Been Moved to a Preferred Place in Line Ahead of Plaintiffs:

The Fund has informed the parties and the Court that currently, the superior secured creditor, Textron Financial, is owed a total of approximately $4 million, down from approximately $7 million owed in October 2007. (Ex. O; Ex. G.) The secondary, previously unsecured creditors, are currently owed $7.5 million, *up* from the $4,950,000 they were owed in May 2008. (Ex. O; Ex. J.) Even disregarding the fact that the Fund has allowed certain insider investors to jump ahead of the line by moving them to secured status in a series of agreements, all of the Fund's properties are currently in default, and given the state of the current real estate market, it is highly unlikely whether the Fund will ever be able to liquidate its assets and raise enough capital to pay off first Textron, then the previously unsecured creditors, and then finally, Plaintiffs and the remaining equity investors.

There is also the matter of legal representation and who exactly is paying for the defendants' defense costs.  The Fund is furnishing Barrier with a defense pursuant to what amounts to a worthless undertaking to reimburse the Fund should it be determined he did in fact commit fraud.  Most recently, counsel for the Fund has indicated that the Fund is also reserving its rights to furnish indemnification to certain other unnamed defendants, pursuant to certain other undisclosed agreements the Fund may have with them.  (Giacovas Decl. ¶ 19-25; Litchman Decl. ¶ 26-29.)

All of this representation of the various parties goes on without any accounting regarding who is paying for what party's attorney's fees, and under what authority. According to the terms of the Agreement's indemnification clause, the only party that should be entitled to indemnification by the Fund is the Fund's Managing Member, G&B Partners, Inc., and Mr. Barriger in his capacity as the principal shareholder, director and officer of G&B Partners, Inc. Without a receiver, the Fund could continue to waste fund assets on defending individuals who are not entitled to a defense. All of those funds should be accounted for, for the benefit for *all* of the investors, not just Barriger.

This is not a case where the defendant has threatened to liquidate assets. Amalgamated Consultants Ltd. V. De Savary, 1985 WL 3044 (S.D.N.Y. 1985). The liquidation is happening on a daily basis, and without any third-party disinterested supervision. Indeed, the one individual who is overseeing the liquidation of the Fund is not only the principal defendant and perpetrator of the fraud, but a secured creditor of the Fund. On this basis alone, a receiver is warranted. See Republic of the Philippines v. Marcos, 653 F.Supp. 494 (S.D.N.Y. 1987) (finding "most compelling" factor in favor of receiver was the conflicts of interest between defendants).

Defendants have argued that Textron is overseeing every transaction the Fund conducts. But Textron is a private lender that is concerned only with recovering its loan. Whether any of the equity investors ever see their money is of no concern to Textron.[4] A court-appointed receiver is the only means to ensure that the liquidation is conducted with the interests of all investors, and creditors alike.

   C.   Legal Remedies are Completely Inadequate to Ensure the Fund Does Not
        Continue to Defraud Plaintiffs:

As noted, the Fund is currently in liquidation. The Plaintiffs and other remaining equity investors will only see a return of their investments, if any, after Textron and the

---

[4] We further note, the agreement between Textron and the Fund contains a provision for the appointment of a receiver. It would appear then that Textron would not object to such an appointment; nor should the Fund. (Ex. D, p.4, Sec. 2.5(b).)

previously unsecured creditors are paid.  It is unknown to Plaintiffs how long it will take for Textron to be paid off.  Notably, the debt to Textron dropped from $7 million to $4 million in a matter of three months.  Once Textron is paid, the insider investors and previously unsecured creditors are next in line.

Without court supervision, Barriger as both the Fund's manager and as a secured Creditor, will determine who gets paid, when, and how much.  The only way to ensure that the remainder of the liquidation occurs in such a manner as to protect the interests of Plaintiffs, and of all the other remaining equity investors, is to appoint a receiver.

D.    Plaintiffs' Harm -- the Complete Loss of Their Retirement Funds -- Far Outweigh any Potential Harm to Defendants, Especially Given Their Agreement With Textron Financial Provides for the Appointment of a Receiver:

It seems elementary, that in such a situation as this, the unsecured outsider equity investors stand much more to lose if a receiver is not appointed.  Without anyone to oversee the liquidation of the Fund, Barriger will be left to monitor himself.  The records in this case prove that Barriger cannot be trusted to take the interests of the outsider equity investors into consideration when determining how to distribute the Fund's assets. Moreover, it seems elementary that when accused of fraud, as Barriger and the Fund have been here, they would welcome an objective third-party to prove that no such fraud has taken place.  The Fund should have nothing to hide.  The fact that it is vigorously fighting transparency, in the face of these allegations, speaks volumes.

Finally, as noted previously, the agreement between the Fund and Textron already calls for the appointment of a receiver under certain circumstances.  Thus, the Fund has already recognized the need (and agreed) to allow an independent receiver to be appointed.  With the Fund in liquidation, this is certainly an appropriate time to provide such oversight.  (Ex. D, p.4, Sec. 2.5(b).)

E.  <u>Plaintiffs' Probability of Success is High – the Probability That They Will Never Recover When They *Do* Prevail is Even Higher:</u>

As fully argued in Part III A, given the clear evidence of fraud in this case, it is likely that Plaintiffs will prevail on some or all of their claims.  The appointment of a receiver is the only way to ensure that the Fund will not dissipate assets that could frustrate the Plaintiffs ability to collect on any judgment that may be rendered in their favor.

## IV.
## <u>CONCLUSION</u>

For all of the foregoing reasons, Plaintiffs jointly and respectfully request that this Court issue an Order Granting Plaintiffs' Joint Motion for the appointment of a receiver over the Gaffken & Barriger Fund, LLC, and further grant any further relief as the Court may deem just and proper.

Dated: January 23, 2009
New York, New York

LAZARE POTTER & GIACOVAS LLP

By:

Robert A. Giacovas
Lainie E. Cohen
950 Third Avenue
New York, New York  10022
Telephone (212) 758-9300
Facsimile:  (212) 888-0919
rgiacovas@lpgllp.com
lcohen@lpgllp.com
Attorneys for Plaintiff, Frank Owens

RONALD JAY LITCHMAN

By: _____ /s/ _____
Ronald Jay Litchman
96 North Main Street

16

Liberty, New York  12754
Telephone: (845) 292-8083
Facsimile:  (866) 480-3772
rjlesq@mindspring.com
Attorney  for  Plaintiffs,  Martha  Graham,
Maria  Grimaldi,  Lloyd  Heller,  Paula
Manzolillo  and  Creamton  Maple  Trust
F/B/O Carl Mills