K&L GATES LLP
1601 K Street
Washington D.C. 20006-1600
Phone: (202) 778-9000
Fax: (202) 778-9100

Richard A. Kirby (RK-7674)
Lisa M. Richman (LR-4927)

*Attorneys for Defendant Gaffken & Barriger Fund, LLC*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------x

FRANK OWENS,

           Plaintiff,

   v.

GAFFKEN & BARRIGER FUND, LLC, *et al.*,

           Defendants.

----------------------------------------------------------------x

MARTHA GRAHAM, *et al.*,

           Plaintiff,

   v.

LLOYD V. BARRIGER, *et al.*,

           Defendants.

----------------------------------------------------------------x

CASE NO. 08-CIV-8414(WCC)
ECF Case

CASE NO. 08-CIV-9357 (WCC)
ECF Case


**DEFENDANT GAFFKEN & BARRIGER FUND, LLC'S MEMORANDUM IN
OPPOSITION TO PLAINTIFFS' JOINT MOTION FOR THE APPOINTMENT OF A
RECEIVER**

# TABLE OF CONTENTS

**Page**

I. PRELIMINARY STATEMENT ........................................................................................... 1

II. STATEMENT OF FACTS ................................................................................................. 2

    A. Plaintiffs Have Failed to Substantiate Fraud on the Part of the Fund .................... 2

        1. The Graham Plaintiffs' allegations conflict with the evidence before the Court. ................................................................................... 2

        2. Owens' fraud claim is belied by his representation by counsel. ................. 3

        3. The guarantee is not evidence of fraud. ...................................................... 4

        4. Neither the fluctuating borrowing base nor borrower bankruptcy substantiates fraud. ..................................................................................... 5

    B. There Is No Evidence of Inappropriate Affiliate Transactions ............................... 6

        1. The "Insider" companies to whom Plaintiffs point were legitimate business entities whose existence and functions were fully disclosed. .................................................................................................... 6

        2. Loans to the Fund had a legitimate business purpose and were made on commercially reasonable terms ..................................................... 8

    C. Fund Management Is Assisted by Outside Experts .................................................. 9

        1. The Fund has retained an asset valuation expert to assist with maximizing the eventual return to preferred shareholders ......................... 9

        2. The Fund has retained a litigation consultant to assist with litigation management and cost control ...................................................... 11

        3. The Fund's finances are subject to continual review by its secured lender ........................................................................................................ 11

    D. A Receivership Would Not Be an Effective Use of Fund Resources and Is Opposed by a Substantial Portion of Fund Creditors and Investors .................... 12

III. ARGUMENT ................................................................................................................. 13

    A. Plaintiffs' Claims Are Legal in Nature and the Court Lacks Power to Grant Them Equitable Relief ................................................................................ 13

    B. Even if the Court Entertains Their Request, Plaintiffs Are Not Entitled to the Preliminary Equitable Relief of Appointment of a Receiver ........................ 15

        1. Plaintiffs fail to demonstrate that they are substantially likely to succeed on the merits of their claims ......................................................... 16

            a. Plaintiffs have made no evidentiary showing in support of their claims .................................................................................. 16

            b. Plaintiffs cannot demonstrate a substantial likelihood of success on their fraud claims ................................................................ 17

                i. The Graham Plaintiffs' fraud claims conflict with the documents they signed ................................................. 18

i

ii.    Owens' fraud claims are not credible, in light of his representation by counsel, and the evidence that his counsel had copies of the Fund PPM ............................... 18

c.    Plaintiffs' assertions about insider loans are not accurate and do not justify appointment of a receiver ................................. 19

d.    Even if Plaintiffs' allegations amounted to fraud, there is no nexus between the alleged fraud and mismanagement of the Fund that would justify the appointment of a receiver ................. 19

2.    Plaintiffs fail to show they are likely to suffer irreparable harm if their motion is not granted ........................................................................ 20

a.    There is no evidence of danger of squandered property or resources ................................................................................... 20

b.    The Fund has retained third-party expert assistance to advise it in the management of its operations .............................. 22

3.    Plaintiffs fail to establish that the balance of equities tips in their favor ........................................................................................................ 23

4.    Plaintiffs fail to show that appointment of a receiver is in the public interest ............................................................................................ 24

IV.  CONCLUSION ............................................................................................................. 25

# TABLE OF AUTHORITIES

Page

**Cases**

Brick v. Dominion Mortgage & Realty Trust,
442 F. Supp. 283 (W.D.N.Y. 1977) ...................................................................... 16

Brown v. Keane,
355 F.3d 82 (2d Cir. 2003) .................................................................................. 17

Doninger, P.P.A. v. Niehoff,
527 F.3d 41 (2d Cir. 2008) ...................................................................... 16, 17, 21

Drob v. Nat'l Mem'l Park, Inc.,
41 A.2d 589 (Del. Ch. 1945) ............................................................................... 24

Ferguson v. Tabah,
288 F.2d 665 (2d Cir. 1961) .......................................................................... 15, 20

Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.,
527 U.S. 308 (1999) ...................................................................................... passim

In re Worldcom, Inc. Sec. Litig.,
219 F.R.D. 267 (S.D.N.Y. 2003) ........................................................................ 25

JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev't & Trade Servs., Inc.,
295 F. Supp.2d 366 (S.D.N.Y. 2003) ................................................................. 13

Republic of the Philippines v. Marcos,
653 F. Supp. 494 (S.D.N.Y. 1987) ..................................................................... 21

Rosen v. Siegel,
106 F.3d 28 (2d Cir. 1997) ...................................................................... 15, 17, 21

Sunward Elecs., Inc. v. McDonald,
362 F.3d 17 (2d Cir. 2004) ................................................................................. 17

Versames v. Palazzolo,
96 F. Supp. 2d 361 (S.D.N.Y. 2000) ..................................................... 15, 17, 20, 23

Wickes v. Belgian Am. Educ. Found., Inc.,
266 F. Supp. 38 (S.D.N.Y. 1967) ......................................................... 14, 15, 16

Winter v. Natural Res. Def. Council,
129 S.Ct. 365 (2008) ................................................................ 15, 16, 20, 23

**Statutes**
28 U.S.C. §1746 ..................................................................................................... 16

**Rules**
Fed. R. Civ. Pro. 8(d) ............................................................................................ 16

Fed. R. Evid. 602 .................................................................................................... 17

Fed. R. Evid. 901 .................................................................................................... 17

# I.    PRELIMINARY STATEMENT

Plaintiffs' motion for appointment of a receiver for the Gaffken & Barriger Fund (the "Fund") falls far short of satisfying the heavy burden required to impose this drastic remedy. Plaintiffs, who did not pray for any form of equitable relief in their Complaints, have simple claims for money damages. This Court lacks the power to grant them any equitable relief, let alone the extraordinary relief of an equity receiver. *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 321-22 (1999).

If the Court does consider this request, Plaintiffs must show both a substantial likelihood of success on the merits of their fraud claims *and* that they are likely to suffer irreparable harm amounting to an emergency in the absence of a receivership. They cannot show either.

Plaintiffs fail to offer a single piece of competent evidence in support of their request. Their motion is supported solely by allegations in their unverified Complaints, as reiterated without foundation in the declarations of counsel, and a handful of unauthenticated "exhibits."[1] In any event, Plaintiffs' conclusory allegations that they were misled about the nature of their investments, even if true, bear no nexus to the need for a receiver: the fraud claims center on the Fund's communications with potential investors, but it is undisputed that the Fund is not raising additional money from new investors at this time.

Even assuming their fraud claims were relevant to the need for a receiver, Plaintiffs cannot sustain their burden to show likely success on the merits. Plaintiffs' allegations that they were deceived about the nature of their investments in the Fund are contradicted by the very Fund documents included with the Graham Plaintiffs' Complaint. Moreover, the Fund has submitted substantial evidence with this opposition that refutes their assertions. Plaintiffs'

---

[1] Plaintiffs' submissions are so woefully inadequate under basic rules of evidence that the Fund moves to strike them in their entirety. *See infra* n. 15.

allegations about possible insider transactions fall far short of the need to show irreparable harm, as these transactions were fully disclosed and made on commercially reasonable terms.

As demonstrated below, the evidence before the Court shows that Fund operations are being ably managed by experienced professionals in the face of an unprecedented economic downturn infecting the entire nation's economy. Moreover, a large bloc of informed investors opposes the appointment of an equity receiver. In the face of this substantial evidence, the request for a receiver by Plaintiffs, a dissident faction of Fund investors, should be denied.

## II.    STATEMENT OF FACTS[2]

### A.    Plaintiffs Have Failed to Substantiate Fraud on the Part of the Fund.

Plaintiffs' claims against the Fund are premised on the assertion that the Fund or its agents intentionally defrauded Plaintiffs at the time of their investments by misrepresenting the nature and risk of the Fund. The legal insufficiency of Plaintiffs' fraud allegations is addressed in several pending dispositive motions,[3] and further refuted as detailed below.

### 1.    The Graham Plaintiffs' allegations conflict with the evidence before the Court.

The Graham Plaintiffs' allegations that they did not know about the risk of investing are inconsistent with Fund documents that repeatedly discuss such risk. *See* MTD Graham Mem. at 8-13; MSJ Mem. at 4-10. Specifically, the Fund's December 24, 1998 Private Placement

---

[2]  The appointment of a receiver is an extraordinary remedy requiring a compelling factual showing of the need for such relief. *See* Section III.B., *infra.* Substantial evidence refuting Plaintiffs' claims is filed herewith in the Declaration of Lloyd V. Barriger in Opposition to Receivership ("Barriger Opp."), Declaration of William V. Quinn in Opposition to Receivership ("Quinn Decl."), and Declaration of Suzanne R. Loughlin in Opposition to Receivership ("Loughlin Decl.").

[3]  Rather than repeat the facts underlying those motions, the Fund incorporates herein by reference in their entirety its Motion to Dismiss the Graham Complaint and supporting materials ("MTD Graham"), its Motion to Dismiss the Owens Complaint and supporting materials ("MTD Owens"), and its Motion for Partial Summary Judgment on the Graham Plaintiffs' claims and supporting materials ("MSJ"). Specific documents filed in support of those motions are referenced by title and page, *e.g.*, MTD Graham Mem. at 5.

Memorandum ("1998 PPM"),[4] periodic communications from the Fund, and a 2005 LLC Amendment explicitly notified investors of the risk involved with investing in the Fund and the potential illiquidity of their investments. *See* MSJ Mem. at 3-9.

Likewise, Plaintiffs' assertion that they were never advised that the Fund invested in commercial mortgages is contradicted not only by Fund communications,[5] but also by their own signatures. In September 2005, the Fund formally amended its LLC agreement to confirm that its investment strategy had changed from micro-cap stocks to commercial real estate financing. Barriger Opp. Ex. A, at 3. ***Plaintiffs who held investments in 2005 specifically approved this LLC Amendment***. *See* Barriger Opp. Ex. B (Heller signature); Ex. C (Manzolillo signature); Ex. D (Grimaldi signature); Barriger Opp. Ex. E (Mills note confirming "willing[ness] to extend you considerable flexibility regarding your choice of investments in the portfolio"). Graham, who first invested two years later, signed similar documents. *See* Barriger Opp. Ex. F (2007 LLC) at 5 (similar purpose clause); Ex. G (2007 PPM) at 6-7, 14-16 (detailed warnings of risk of mortgage lending practice); Exs. H & I (Graham signature pages).

2.  Owens' fraud claim is belied by his representation by counsel.

Owens alleges that he was duped into investing by oral representations that the Fund was like a money market account. Owens Compl. ¶ 12. Owens approached the Fund on the advice of Morty Baum, his attorney. *Id*. ¶¶ 17, 62. Over the years, Baum has directed other investments in the Fund and has been provided copies of Fund governing documents and information about the Fund's nature and operations. Barriger Opp. ¶ 70; Ex. L.

Contrary to Owens' assertions, Fund management did not tell Owens that the Fund was "like a money market account" and that it carried no risk. Barriger Opp. ¶ 73. After meeting

---

[4] The 1998 PPM is attached as Exhibit 1 to the Graham Complaint.

[5] *See* MTD Graham Mem. at 3-4; MSJ Mem. at 4-6.

with Owens, the Fund mailed him a copy of the 2007 PPM and LLC Agreement for his consideration. *Id*. ¶ 74; Ex. M (September 26, 2007 letter enclosing documents).

Apparently Owens, upon consultation with Baum, decided to invest $2 million in the Fund *before* receiving the PPM and governing documents. Owens did not notify the Fund prior to instructing Baum to transfer funds from Baum's trust account into the Fund's account.[6] Barriger Opp. ¶ 75. Fund management discovered Owens' investment when it checked the Fund's account shortly after the deposit was made and assumed, based on this unilateral act, that Owens had received enough information from the meeting and Baum to fully evaluate whether the Fund was appropriate to his needs. *Id*. ¶¶ 75-77. The Fund had no reason to second guess this, as both Owens and Baum are sophisticated businesspeople. *Id*. ¶ 77.

Owens never tried to redeem his shares or otherwise withdraw his funds before the March 2008 redemption freeze, even after receiving numerous Fund communications that directly conflicted with his ostensible understanding of the Fund as a money market account. *Id*. ¶ 78.

        3.      <u>The guarantee is not evidence of fraud.</u>

Plaintiffs assert that Barriger's personal guarantee to investors was fraudulent because their guaranteed return was suspended when redemptions were frozen in March 2008. Mem. at 2, 7, 10. The Fund's 2005 LLC Amendment, as restated in the 2007 LLC Agreement, created two classes of equity investors: common shares and preferred shares. The common shares were subordinated to the preferred shareholders' right to receive an 8% cumulative share of Fund profits. *See* Barriger Opp. Ex. A, at 4; Ex. F, at 4. If the net profits of the Fund are insufficient to distribute the preferred return to the preferred members, the owner of the managing member of

---

[6] The allegation in Plaintiffs' motion that Barriger took Owens' money and deposited it without his consent directly contradicts Owens' Complaint, which makes clear that Owens' attorney initiated the transfer. *Compare* Mem. at 10, *with* Owens Compl. ¶ 23. *See also* Barriger Opp. Ex. N (transfer slip from Catskill Hudson Bank showing a $2 million transfer from "F. Owens c/o Baum Law Office" to the "Gaffken & Barriger Fund" "per … Morty Baum").

the Fund (Lloyd Barriger) is obligated to contribute the shortfall to the Fund, thereby guarantying the preferred return. Barriger Opp. Ex. A, at 4; Ex. F, at 7. The 8% return is obviously subject to the Fund's ability to generate sufficient returns to pay it. Likewise, Barriger's ability personally to make up any shortfall is subject to his personal finances. *See* Barriger Opp. ¶ 25. Plaintiffs do not allege, much less demonstrate, that at the time the guarantee was made or reiterated, Barriger knew that the Fund would experience a decline so extreme it would outpace his financial ability to cover the 8% return. *See id.*

4.  Neither the fluctuating borrowing base nor borrower bankruptcy substantiates fraud.

Plaintiffs claim that the Fund's "health" can be assessed through scrutiny of the Fund's Borrowing Base history and that this is "irrefutable evidence" that the Fund misrepresented itself. Plaintiffs rely on their attorneys' declarations, which assert without foundation that the Borrowing Base certificates reflect the Fund's "strength at any given time." Mem. at 3-4.

A given Borrowing Base certificate, which was prepared by the Fund and sent periodically to its secured lender, is a reflection of the Fund's then-current ability to draw on its secured line of credit as defined in its particular loan covenants, and is not a useful proxy for the value of Fund equity. Quinn Decl. ¶ 22. It simply defines the extent to which the Fund's secured lender will advance additional credit at that time. *Id.* The Borrowing Base fluctuated as the Fund drew on its line of credit, as loans were repaid, and as the Fund incurred periodic expenses. *Id.* Far better proxies for the Fund's strength would be the value of its collateral or the behavior of Textron, which regularly audited the Fund's books and records and its loan portfolio and maintained the Fund's substantial line of credit. *Id.*

Plaintiffs also point to the bankruptcy of one of the Fund's borrowers in late 2007 as evidence that the Fund was misrepresenting its health to investors. Mem. at 5. Yet, the default

and/or bankruptcy of some borrowers in the subprime area is not necessarily predictive of loss to the Fund and was an anticipated aspect of the Fund's business. Barriger Opp. ¶ 17. Because borrower default is a risk with subprime loans, the Fund attempted to minimize the risk of loss on its loans through a number of strategies. Quinn Decl. ¶ 20. For example, the Fund required adequate collateral, used arm's length appraisals to verify collateral values, and chose lending opportunities with a loan-to-value ratio in the 65-75% range, which is considered a "conservative" lending practice within the industry. *Id.*; Barriger Opp. ¶ 18. With those protections in place, any single borrower's default or bankruptcy posed more of a timing problem on loan repayment than a risk to Fund value. Barriger Opp. ¶ 18. Because of fees associated with defaults, the Fund usually made money when borrowers defaulted. *Id.* Thus, there was no reason to notify investors in the event of an individual borrower's default. *Id.* ¶ 17.

**B.      There Is No Evidence of Inappropriate Affiliate Transactions.**

       1.      <u>The "Insider" companies to whom Plaintiffs point were legitimate business entities whose existence and functions were fully disclosed.</u>

Plaintiffs complain about the existence of interrelated companies that engaged in what they characterize as "insider" transactions with the Fund. These companies were undisclosed, Plaintiffs claim, and as such, their existence and transactions with the Fund are allegedly evidence of fraud. Mem. at 4-5, 10-11.

At the time Barriger began the Fund, two additional companies were formed to execute its management and investment activities. Barriger Opp. ¶ 8. G & B Partners, Inc., served as the Managing Member of the Fund, as disclosed in the PPM. 1998 PPM at (i). G&B Partners raised initial funding for the Fund and was later responsible for the funding necessary to create two classes of equity holders (with G&B Partners assuming the role of common equity). Barriger Opp. ¶ 8. G&B Partners made no loans to the Fund. *Id.*

Gaffken & Barriger Company, Inc. was created in 1998 as the initial Investment Manager of the Fund. It and its successor[7] were paid a disclosed fee. *Id.* ¶ 9; 1998 PPM at 20; Barriger Opp. Ex. G (2007 PPM) at 28-29. At the time of the March 2008 freeze on investor redemptions, Barriger waived the management fee and it has been in abeyance since that time. Barriger Opp. ¶ 9. Gaffken & Barriger Company did not make loans to the Fund. *Id.*

Two other companies in which Barriger had a financial interest also did business with the Fund: Campus Capital and Barriger Capital. Barriger and two other partners formed Campus Capital in 2000; Barriger did not control Campus Capital. Barriger Opp. ¶ 61. Campus Capital was a private investment vehicle similar to the Fund, but which offered investors fixed returns by way of notes with fixed rates and fixed maturity. *Id.* ¶ 62. On occasion, Campus Capital and the Fund pooled resources to invest in larger real estate projects that neither believed would be in their best interests to do alone. *Id.* Such projects were subject to Campus Capital's separate due diligence efforts, which further reduced the Fund's risk. *Id.* Campus Capital was also an equity investor in the Fund. In such transactions, Campus Capital was treated the same as any other preferred equity investor in the Fund, including with regard to any redemption requests.[8] *Id.*

Barriger Capital LLC was formed in 2005 to perform the administrative tasks of servicing the loans held by the Fund, Campus Capital, and others, thereby reducing the Fund's administrative costs. *Id.* ¶ 63. The Fund paid a monthly fee to Barriger Capital that covered all operational expenses, including salaries, rent, and associated administrative costs. *Id.* When the

---

[7] After William Gaffken died in 2000, Gaffken & Barriger Company was dissolved and Bridgeville Management, LLC succeeded to the investment manager duties. It had the same role and function, but was wholly owned by Barriger. Barriger Opp. ¶¶ 9-10.

[8] These requests were handled in the regular course of the Fund's business. *Id.*

Fund experienced short term liquidity issues, Barriger Capital was able to draw on its own line of credit to loan cash to the Fund on commercially reasonable terms.[9]  *Id.*

Both Campus Capital and Barriger Capital were stand-alone businesses that benefited the Fund through cost sharing.  The PPM expressly discloses that the Fund's managers may be involved with other companies such as these two entities.  1998 PPM at 14, 23; Barriger Opp. Ex. F (2007 LLC) at 19.  Indeed, Investors in the Fund waived any conflicts and consented to such activities when they signed the LLC Agreement.  *See id.*

2.  Loans to the Fund had a legitimate business purpose and were made on commercially reasonable terms.

Individual and corporate investors from time to time loaned money to the Fund.  Mem. at 5-7.  Plaintiffs speculate that these loans were somehow fraudulent.  *Id.* at 4.  To the contrary, these loans were anticipated and were made on terms the Fund found commercially reasonable.  *See* Barriger Opp. Ex. F (2007 LLC) at 8; Barriger Opp. ¶ 52, 62.

The Fund's liquidity could fluctuate at any given time as specific investments were made and loan repayments were received.  *Id.*  From time to time, the Fund borrowed money from a few of its equity investors (the "note holders") on a short term unsecured basis on commercially reasonable terms equivalent to the terms of the Fund's agreement with Textron.  *Id.*  By accepting loans from individual equity investors, the Fund expanded its available liquidity.  *Id.*  The availability of this additional source of liquidity also permitted Fund management in the exercise of its discretion to offer a more flexible redemption policy than the rigid financial

---

[9] In spring 2008, the Fund cancelled its contract with Barriger Capital and subsequently, Barriger Capital was dissolved.  Barriger Opp. ¶ 65.

hardship policy set forth in its revised 2005 operating agreement.[10]  These loans were treated completely separately from any note holder's equity investment in the Fund.  *Id*.

The Fund also periodically borrowed funds from Barriger Capital and Campus Capital.  *Id*. ¶¶ 62-63.  These loans, similar to the other loans from equity investors, were offered on commercially reasonable terms.  *Id*.  In early 2008, shortly before the freeze on redemptions, Barriger Capital loaned the Fund a net additional sum of $50,000.[11]  *Id*. ¶ 64.  As of the March 2008 freeze on redemptions, this loan was outstanding and it remains outstanding to date.  *Id*.[12]

Following the Fund's default on its secured line of credit with Textron in the spring of 2008, Textron froze all Fund payments.  *Id*. ¶¶ 56-57.  This caused the Fund to default on its monthly interest payments to its unsecured lenders, and resulted in the Fund entering into forbearance agreements with both its secured and unsecured lenders on commercially reasonable terms.  *Id*. ¶ 57.  Plaintiffs fail to explain how any of this activity amounts to fraud.

**C.  Fund Management Is Assisted by Outside Experts.**

1.  <u>The Fund has retained an asset valuation expert to assist with maximizing the eventual return to preferred shareholders.</u>

On August 27, 2008, the Fund retained Fast4ward Capital Group, Inc. ("Fast4ward"), a company that provides investment, asset management, and project finance consulting services, to advise it in connection with its workout of non-performing loans.  Barriger Opp. ¶¶ 44-45; Quinn Decl. ¶ 8.  The Fund asked Fast4ward to review the Fund's portfolio, advise it on how to

---

[10] Plaintiffs criticize two such redemptions made in early 2008, Mem. at 7, but these were planned redemptions made in the Fund's regular course of business and were not unusual.  Barriger Opp. ¶¶ 36-39.  Prior to the March 2008 freeze, the Fund never refused an investor's redemption request.  *Id.* ¶ 41.

[11]  Barriger Capital was repaid $400,000 in January 2008, but lent the Fund $450,000 shortly thereafter.  Barriger Opp. ¶ 64.

[12] Plaintiffs also reference a 2007 Campus Capital transaction and an unrelated lawsuit as potential evidence of fraud.  Mem. at 11.  The current loan from Campus Capital, however, arises from a Fund debt due from a put option in a joint mortgage venture and the Fund is named as a relief defendant only in the suit.  *See* Barriger Opp. ¶ 66, 43.

maximize the value of the individual investments, and oversee the execution of a value-maximizing plan for each asset. Quinn Decl. ¶ 8. With any given asset, these plans may include the Fund taking possession of the collateral, selling the collateral, pursuing personal guarantees, pursuing legal claims such as appraisal fraud, and negotiating with constituents. *Id.* Fast4ward is paid on a contingency fee basis when an asset is sold or redeemed, *i.e.*, when a successful event occurs and money is collected. *Id.*

Before Fast4ward accepted the engagement, it met with Fund management and reviewed the Fund's loan portfolio and business operations. *Id.* ¶ 10. In the intervening months, Fast4ward has had complete access to the Fund's books and records and Fund management. *Id.* ¶ 11. Fast4ward has seen no evidence of fraud or improper behavior by the Fund during its detailed review. *Id.* ¶ 12.

As described above, the Fund attempted to minimize the risk associated with its loans. *Id.* ¶ 20. Rather than a result of mismanagement or fraud, the Fund's liquidity crisis is a result of the severe downturn in the economy and, in particular, the real estate and mortgage industry sectors. *Id.* ¶¶ 14-17. As Fast4ward notes, approximately 95% of the Fund's borrowers (or customers) have defaulted on their contractual obligations and stopped paying the Fund – and no business can survive an event where 95% of its customers stop buying its product. *Id.* ¶ 14.

Notwithstanding the precipitous downturn in the market, the Fund is working with Fast4ward to maximize the return on its loans. *Id.* ¶¶ 8, 23. The issues that impact the success of these efforts (availability of working capital, time to negotiate maximum value, ability to reject low-ball offers, resources to pursue assets through the bankruptcy process or to pursue other legal claims, among others) are detailed extensively in the materials submitted herewith.

*See id.* ¶¶ 26-35.  In 2008, with the skilled assistance of Fast4ward, the Fund obtained

approximately 94% of its balance sheet value on liquidation of 23 of its investments.  *Id.* ¶ 23.

2.      The Fund has retained a litigation consultant to assist with litigation management
        and cost control.

In September 2008, with the approval of its creditors, the Fund retained Firestorm to

provide both crisis and litigation management support.  Barriger Opp. ¶ 48; Loughlin Decl. ¶¶ 3-

4.  Firestorm is an independent business continuity consulting firm with a strong focus on

vulnerability analysis, risk mitigation and crisis management.  Loughlin Decl. ¶ 2.  Firestorm

conducted a vulnerability analysis of the Fund, identifying immediate needs for administrative,

accounting and litigation support, expense control initiatives, consolidation, and operational

support for retention of Fund value.  *Id.* ¶ 5.

The Firestorm principal working with the Fund is a licensed attorney with significant

litigation experience.  *Id.* ¶¶ 4, 6-7.  Firestorm is thus able to advise the Fund in litigation

expense management and risk analysis related to the defense of the currently pending lawsuits

and a related SEC inquiry.  *Id.* ¶ 8.  Firestorm's focus has been in reducing the overall litigation

costs to the Fund through consolidation of legal services, exploring early settlement efforts, and

reviewing and monitoring both legal budgets and billings.  *Id.* ¶¶ 9-10.  Firestorm has

independently concluded that it is in the Fund's best interests to mount a vigorous defense to the

asserted claims in these actions, and that the decision to incur legal costs associated with the

defense of these cases is both reasonable and justified.  *Id.* ¶ 10.

3.      The Fund's finances are subject to continual review by its secured lender.

Under the terms of its line of credit, the Fund's lending practices and books and records

have been subject to external review and scrutiny from its primary lender, Textron.  Barriger

Opp. ¶ 20.  The Fund provides Textron with monthly financial statements, general ledger trial

balances, general ledger charts of accounts, bank statements, reconciliation of the bank statements to the general ledger, cancelled checks, cash disbursements journal, month end listing of outstanding mortgages receivable, document files pertaining to open mortgages, underwriting files for mortgages, loan payment history for the mortgages, and bad debt write-offs or adjustments to mortgages. *Id.*; *see also* Quinn Decl. ¶ 21. Since its default on its secured lending line of credit in March 2008, the Fund has paid down its line of credit from $9.6 million to $4.5 million. Barriger Opp. ¶ 42. Under the terms of formal forbearance agreements entered into with Textron, the Fund provides Textron with monthly operating reports and Textron advances operating costs to the Fund based on a budget process spelled out in the forbearance agreement. *Id.* ¶ 58. The Fund remains in full compliance with its present forbearance agreement with Textron. *Id.*

**D.      A Receivership Would Not Be an Effective Use of Fund Resources and Is Opposed by a Substantial Portion of Fund Creditors and Investors.**

In the opinion of the Fund's third party advisors, the appointment of a Receiver would not increase, and could negatively impact, the Fund's ability to maximize the value of its assets and the corresponding return to investors. Quinn Decl. ¶¶ 36-41; Loughlin Decl. ¶ 15.

More importantly, the Fund's investors do not support this effort. Barriger Opp. ¶¶ 80-82, Exs. O, P. The Fund sent notice of the pending motion to all current investors and creditors, including the individual Plaintiffs in these cases, and invited them to attend in person a meeting for the purpose of providing information about the current status of the Fund's financial circumstances and its operations. *Id.* ¶¶ 50-51; Ex. J (investor invitation). The meeting was held on January 29, 2009, and was attended by over 65 investors and creditors. *Id.* ¶ 51; Ex. K. At that meeting, Fund management briefed attendees on the Fund's financial condition and on the issues confronting the Fund on workout of its non-performing assets, including a detailed

briefing by Fast4ward.  Barriger Opp. ¶ 50.  The Fund also advised investors of its litigation defense strategy and its intent to oppose the request for receivership.  *Id.*  Following that meeting, the Fund sent a summary of the meeting to all investors, including those who were unable to attend in person.  Barriger Opp. ¶ 51; Ex. K.

As a result of that meeting, the Fund has received several unsolicited letters of support from its investors.  Barriger Opp. Exs. O, P.  In addition, it has received sworn statements from more than 55 investors, including one of its note holders, opposing the appointment of a receiver.  Barriger Opp. Ex. Q; Declaration of Ray S. Pantel in Opposition to Motion for Appointment of Receiver.  Those investors opposed to receivership substantially outnumber Plaintiffs.  Barriger Opp. ¶¶ 81-82.  Indeed, other than Plaintiffs themselves, the Fund knows of no investor who supports receivership.  *Id.* ¶ 82.

## III.    ARGUMENT

### A.    Plaintiffs' Claims Are Legal in Nature and the Court Lacks Power to Grant Them Equitable Relief.

Plaintiffs request the appointment of a receiver solely in hope of collecting on a future money judgment in these lawsuits.  Mem. at 13-14 ("The appointment of a receiver is the only way to ensure that the Fund will not dissipate assets that could frustrate the Plaintiffs' ability to collect on any [future] judgment …").  Yet, Plaintiffs' claims are legal rather than equitable, and pre-judgment equitable relief to secure a possible future judgment is not available to them.  This Court lacks the power to grant such relief in this case.  *Grupo*, 527 U.S. at 321-22.

Plaintiffs assert claims for monetary damages.  Legal claims such as the personal fraud claims alleged here do not provide a nexus for equitable relief.  *See JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev't & Trade Servs., Inc.*, 295 F. Supp.2d 366, 388 (S.D.N.Y. 2003) (holding that the court lacked power to grant a preliminary injunction where plaintiff brought an

action at law primarily for a money judgment). Here, only one of Plaintiffs' alleged causes of action—unjust enrichment[13]—is arguably equitable in nature. Even where a plaintiff asserts both equitable and legal claims, however, claims are primarily legal where any entitlement to equitable relief is dependent upon success on the legal claims. *Id.* at 389 (holding that plaintiff's claim was primarily legal where it could only obtain the equitable remedy of setting aside an alleged fraudulent conveyance after it proved defendant's liability on the underlying legal action). Plaintiffs' "equitable" claim is expressly based on their fraud allegations. *See* Graham Compl. ¶¶ 242-44; Owens Compl. ¶¶ 57-59. Plaintiffs thus assert no cognizable independent claim for equitable relief.

More significantly, neither Complaint pleads a demand for either preliminary or permanent equitable relief in the form of receivership. A motion to appoint a receiver is a motion seeking preliminary equitable relief similar to a preliminary injunction. *E.g.*, *Wickes v. Belgian Am. Educ. Found., Inc.*, 266 F. Supp. 38, 40 (S.D.N.Y. 1967) ("The appointment of a receiver is, like an injunction, an extraordinary remedy and ought never to be made except in cases of necessity, and upon a clear showing that emergency exists . . . ."). Preliminary equitable relief is appropriate "to grant intermediate relief of the same character as that which may be granted finally," but such relief is not available where a complaint seeks primarily legal remedies. *Grupo*, 527 U.S. at 324-26. A court has no authority in an action for money damages to issue preliminary relief restraining the use of a defendant's assets where a plaintiff claims no lien or equitable interest in the funds. *Id.* at 333.

As explained in *Grupo*, it may be true that "any rational creditor would want to protect his investment" by engaging in a "'race to the courthouse' in cases involving insolvent or near-

---

[13] Subsequent to filing his Motion, Owens withdrew his constructive trust claim. *See* February 17, 2009 letter to the Court.

insolvent debtors." *Id.* at 322. A plaintiff, however, may not use preliminary equitable relief to prevent the dissipation of a defendant's assets merely because the assets could someday be used to satisfy a money judgment. *See id.*

**B.     Even if the Court Entertains Their Request, Plaintiffs Are Not Entitled to the Preliminary Equitable Relief of Appointment of a Receiver.**

Even if the Court were to consider a request for preliminary equitable relief in this case, Plaintiffs fail to establish any of the elements that would entitle them to such relief. Courts agree that "[t]he appointment of a receiver is, like an injunction, an extraordinary remedy and ought never to be made except in cases of necessity, and upon a clear showing that emergency exists . . . .". *Wickes*, 266 F. Supp. at 40; *Versames v. Palazzolo*, 96 F. Supp. 2d 361, 365 (S.D.N.Y. 2000). A party seeking a preliminary injunction must demonstrate that (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in his favor; and (4) that an injunction is in the public interest. *Winter v. Natural Res. Def. Council*, 129 S.Ct. 365, 374 (2008); *see also Versames*, 96 F. Supp. 2d at 365 (listing analogous factors court may consider in deciding whether to appoint a receiver, including inadequacy of available legal remedies and probability that harm to plaintiff outweighs injury to defendants).

A plaintiff seeking the appointment of a receiver, like one seeking a preliminary injunction, bears a heavy burden. *See, e.g.*, *Rosen v. Siegel*, 106 F.3d 28, 33-34 (2d Cir. 1997) ("The appointment of a receiver is considered to be an extraordinary remedy and should be employed cautiously and granted only when clearly necessary . . . .") (quotations omitted); *Ferguson v. Tabah*, 288 F.2d 665, 674 (2d Cir. 1961) (receiver is a "drastic remedy usually imposed where no lesser relief will be effective"). Whether a plaintiff seeks the appointment of a receiver or a preliminary injunction, he must prove two essential elements: (1) a substantial

likelihood of success on the merits of his claim,[14] and (2) a likelihood of irreparable harm

amounting to an emergency.  *See, e.g.*, *Winter*, 129 S.Ct. at 374; *Wickes*, 266 F. Supp. at 40.

      1.    <u>Plaintiffs fail to demonstrate that they are substantially likely to succeed on the merits of their claims.</u>

        *a.*    *Plaintiffs have made no evidentiary showing in support of their claims.*

To justify the appointment of a receiver, Plaintiffs "need support in the form of solid

reasoning founded upon concrete propositions of fact . . . ."  *Wickes*, 266 F. Supp. at 40-41.

Here, Plaintiffs have not offered the Court any concrete propositions of fact, as they have

submitted *<u>no admissible evidence whatsoever</u>* in support of their claims.  Plaintiffs' conclusory

assertions are insufficient to justify the extraordinary remedy they seek.  *See id.*; *Brick v.

Dominion Mortgage & Realty Trust*, 442 F. Supp. 283, 308 (W.D.N.Y. 1977) (denying motion to

appoint receiver in securities fraud case where based on "as yet merely unproven allegations of

wrongdoing and unsubstantiated claims of insolvency").

Plaintiffs' Motion cites to four sources for its assertions:  the two unverified Complaints

and the corresponding declarations of both counsel.  Mem. at 3, n.1.  None of these documents

are competent evidence.  The allegations in Plaintiffs' Complaints are not evidence.  *See* Fed. R.

Civ. Pro. 8(d) (allowing for alternative or inconsistent claims).  The declarations of their counsel

are even less reliable.  One was not submitted under penalty of perjury, in violation of 28 U.S.C.

§1746 (unsworn statements must be subscribed by declarant as "true under penalty of perjury"),

and the other fails to affirm that its contents are true.  *See* Giacovas Decl. (failing to certify under

penalty of perjury that declaration's contents are true and correct); Litchman Decl. (reciting that

declaration is made under penalty of perjury but failing to affirm that contents are true and

---

[14] When the movant seeks a "mandatory" injunction—that is, an injunction that requires a positive act and thereby alters, rather than maintains, the status quo—she must meet the rigorous standard of demonstrating a "clear" or "substantial" likelihood of success on the merits.  *Doninger, P.P.A. v. Niehoff*, 527 F.3d 41, 47 (2d Cir. 2008).

correct).  Both declarations are replete with hearsay, speculation, argumentative assertions and legal conclusions, and address matters about which counsel could not possibly have personal knowledge.  *See* Fed. R. Evid. 602; *Brown v. Keane,* 355 F.3d 82, 90 (2d Cir. 2003) ("It is one of the most basic requirements of the law of evidence that a witness's report may be admitted only where grounds exist for 'a finding that the witness has personal knowledge of the matter' to which the statement relates.").  Moreover, not a single exhibit to either declaration is properly authenticated.[15]  *See, e.g.*, Litchman Decl. ¶¶ 9, 18, 19 (citing to "Exhibits" without any attempt to authenticate); Giacovas Decl. ¶¶ 9-14 (same).  *Compare* Fed. R. Evid. 901.

        **b.**     *Plaintiffs cannot demonstrate a substantial likelihood of success on their fraud claims.*

Even assuming the truth of their allegations, Plaintiffs fail to establish the substantial likelihood of success on the merits as required under *Doninger* and prior cases.  527 F.3d at 47 (citing *Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 24 (2d Cir. 2004)).  As discussed above in Section IIA, Plaintiffs have not established any fraudulent conduct on the part of the Fund.  *See* MTD Graham Mem. at 7; MTD Owens Mem. at 6.  *See also Versames*, 96 F. Supp. 2d at 365 (citing *Rosen*, 106 F.3d at 34) (fraud is relevant factor in deciding whether to appoint a receiver).  Plaintiffs' Motion concedes that the crux of their claim is that the Fund was unable to maintain a "guaranteed" minimum 8% return in a failing real estate market and that somehow this constitutes fraud.  *See* Mem. at 10.  Plaintiffs' allegations, even if accepted as true, fail to make out a claim that would provide a basis for relief.

In determining the likelihood of success on the merits for the purposes of a motion to appoint a receiver, however, the Court need not accept Plaintiffs' fraud allegations as true.

---

[15] For all of these reasons, the Fund respectfully requests that the Court strike the Declarations of Robert A. Giacovas and Ronald Jay Litchman filed in support of Plaintiffs' Motion and all exhibits thereto.  Copies of the Declarations of Messrs. Giacovas and Litchman with inadmissible portions annotated for the Court's convenience are filed herewith as Appendices to this Memorandum.

Instead, the Court must weigh Plaintiffs' unsupported assertions against the substantial evidence submitted by the Fund in opposition to this Motion.  *See generally* Barriger, Pantel, Quinn, and Loughlin Decls., with exhibits thereto, discussed at Section II, *supra*.  Those materials demonstrate that Plaintiffs fall far short of their heavy burden to show a substantial likelihood of success on the merits.

### i. *The Graham Plaintiffs' fraud claims conflict with the documents they signed.*

The Graham Plaintiffs allege that they were not informed that investment in the Fund was risky or speculative, that it involved mortgage lending, or that they could lose their principal. Graham Compl. ¶¶ 6, 63, 207.  As detailed in the pending MSJ, these allegations are flatly contrary to the many disclosures in the Fund's governing documents.  In the face of these explicit documents, some of which they signed, Plaintiffs' claim that they relied upon oral assurances that the Fund was a suitable investment for them as they neared or entered retirement, "comparable to a savings account," *e.g.*, *id.* ¶ 211, are unreasonable and do not establish likely success on the merits.

### ii. *Owens' fraud claims are not credible, in light of his representation by counsel, and the evidence that his counsel had copies of the Fund PPM.*

Owens approached the Fund on the advice of his attorney, who was "very familiar" with the Fund's nature and operations.  Barriger Opp. ¶ 70; Owens Compl. ¶¶ 17, 23, 63.  Thus, Owens had access to abundant information about the nature of the Fund and the speculative nature of any investment.  Contrary to Owens' self-serving assertions, Fund management did not tell him that the Fund was the equivalent of a money market account.[16]  Barriger Opp. ¶ 73.  It

---

[16] Even if someone had made such a representation to Owens, he cannot reasonably claim to have relied on such a statement in light of all the other information to which he had access.  *See* MTD Owens Mem. at 10-12; Owens Compl. ¶ 20 (Owens knew 8% was significantly higher than a money market account return).

was reasonable for Fund management to assume that he had received enough information to evaluate fully with his counsel whether the Fund was appropriate to his needs. *Id*. ¶¶ 73-77. In light of all of this evidence, Owens' claims that he was duped into investing in the Fund by oral representations that it was a money market account are not credible. Owens cannot demonstrate a likelihood of success on the merits.

> c.    *Plaintiffs' assertions about insider loans are not accurate and do not justify appointment of a receiver.*

Plaintiffs' Motion repeatedly asserts that the Fund's alleged activity in "borrowing from some investors to pay off others" justifies the appointment. *See* Mem. at 10, 13-14. Without conceding that such evidence, even if true, would have a nexus to the need for a receiver, Plaintiffs fail to demonstrate the Fund's loans from investors were improper in any way. Mem. at 5, 7. The Fund's LLC Agreement plainly discloses and authorizes loan transactions between the Fund and its investors. Barriger Opp. Ex. F (2007 LLC) at 8. Moreover, these loans were not fraudulent, but were instead done for legitimate business purposes and under terms that were commercially reasonable and fair to the Fund. *See* Section II.B.2, *supra*.

> d.    *Even if Plaintiffs' allegations amounted to fraud, there is no nexus between the alleged fraud and mismanagement of the Fund that would justify the appointment of a receiver.*

Plaintiffs are highly unlikely to succeed on their fraud claims against the Fund, but even if they could make some showing of likely success, the fraud Plaintiffs allege in this case is personal to them and entirely unrelated to any mismanagement of the ongoing Fund operations or the current ongoing liquidation of non-performing Fund assets. Further, the Fund is closed to new investors at this time, so there is no risk that new investors might be misled. Barriger Opp. ¶ 42. Thus, appointment of a receiver is not a remedy for the injury that Plaintiffs claim to have

sustained and, as discussed in Part III.A, *supra*, it cannot be justified merely as a way to ensure that Plaintiffs will be able to collect on any eventual judgment.

Even if taken as true, the alleged misrepresentations as to the Fund's nature and financial health have no bearing on Barriger's ability to manage the Fund's ongoing liquidation of its non-performing assets, especially given the current level of outside assistance and oversight of this process. *See Ferguson*, 288 F.2d at 674 (stating that it is ordinarily presumed that a "'watchdog' over all expenditures" is sufficient to protect corporate assets). Fund management as well as the Fund's creditors, investors, and advisors are all interested in fully maximizing the value of the Fund's investments, and there is simply no basis to assume the contrary. Plaintiffs make no allegations about Fund mismanagement sufficient to justify the extraordinary remedy they seek.

> 2. <u>Plaintiffs fail to show they are likely to suffer irreparable harm if their motion is not granted.</u>

> > *a. There is no evidence of danger of squandered property or resources.*

Plaintiffs make no allegation of imminent irreparable harm sufficient to support their claim for preliminary equitable relief. *See Winter*, 129 S. Ct. at 374. In deciding whether to appoint a receiver, a Court properly considers whether a plaintiff has shown that there is an imminent danger of property being lost, concealed, injured, diminished in value or squandered. *Versames*, 96 F. Supp. 2d at 365. Here, Plaintiffs merely suggest the unsurprising proposition that the Fund has creditors, including secured creditors, who stand ahead of equity investors in line for distribution of the Fund's assets on liquidation. *See* Mem. at 11. The central basis of their claim for appointment of a receiver is their belief that "it is highly unlikely whether the Fund will ever be able to liquidate its assets and raise enough capital to pay off first Textron, then the previously unsecured creditors, and then finally, Plaintiffs and the remaining equity investors." *Id.* But this amounts at most to a fear that equity investors may not receive a return

of their investment – a risk inherent in any market investment; there is no basis to find from this a current danger of irreparable harm rising to the level of an emergency. *Grupo* establishes that potential dissipation of monies that may be used to satisfy a judgment is not a "harm" to be considered under the *Winter* test. *See Grupo*, 527 U.S. at 322.

Plaintiffs likewise fail to establish a danger of irreparable harm with regard to the Fund's loans from investor note holders. As discussed above, these loans were not improper and Plaintiffs had ample notice that such loans could be made. In any case, Plaintiffs' allegations demonstrate a fundamental misunderstanding of the investor creditors' position regarding the Fund's assets. Plaintiffs claim that a receiver should be appointed to prevent investor creditors from "jumping in line" in receiving payment from the Fund. Mem. at 11-12. But investors who are also creditors of the Fund are only creditors up to the amount of their loans. Barriger Opp. ¶ 59.[17] They cannot "jump in line" to receive a return on their equity investments.

Finally, Plaintiffs claim Barriger's position as a secured creditor of the Fund constitutes a conflict of interest that is sufficient by itself to warrant appointment of a receiver. Mem. at 12. This assertion is factually inaccurate. Barriger Opp. ¶ 67. Further, a conflict of interest does not justify appointment where a defendant is aware of his fiduciary duties and is subject to oversight. *See Rosen*, 106 F.3d at 34 (declining to appoint receiver despite claimed conflict of interest where defendant was reminded of his fiduciary duties and court could gauge level of efforts). The extraordinary case Plaintiffs cite is wholly distinguishable from their showing here. *See Republic of the Philippines v. Marcos*, 653 F. Supp. 494, 496-98 (S.D.N.Y. 1987) (receiver appointed where "undisputed and clearly demonstrated" facts, including defendants' repeated

---

[17] As the Supreme Court emphasized in *Grupo*, to the extent that a payment proves to be improper, the law of fraudulent conveyance is designed to remedy such claims, not equitable relief. 527 U.S. at 322.

obstruction of discovery, refusal to testify, and substantial conflicts of interest "powerfully justif[ied] the appointment").

      b.    *The Fund has retained third-party expert assistance to advise it in the management of its operations.*

Plaintiffs attempt to bolster their argument that irreparable harm is likely by alleging that the Fund's management is not subject to third-party oversight. Mem. at 12. The Fund LLC operating agreement provides standard oversight checks on management typical of private equity funds.[18] *See generally* Barriger Opp. Exs. F (2007 LLC) and G (2007 PPM). Plaintiffs can hardly complain about such checks, since they were fully disclosed to them at the time of their investment. *See* Section II.A, *supra*. In any event, there is substantial evidence before the Court that Fund management is prudently managing Fund assets. The Fund has the benefit of Textron's review and the services of independent professionals to advise it on the careful liquidation of its non-performing assets. *See generally* Quinn Decl.

Plaintiffs also complain about the Fund's payment of defense costs as imminent irreparable harm. Mem. at 12. The fact that the Fund is incurring costs of defense in the face of Plaintiffs' own lawsuits is hardly irreparable harm. The Fund operating agreement plainly obligates the Fund to indemnify its Managing Member and Investment Manager when claims are asserted against them in accordance with the usual standards for such indemnification. 1998 PPM at 23, 25; Barriger Ex. F (2007 LLC) at 20. Indeed, prior to bringing suit, investors should carefully calculate the cost to the Fund of such claims, as the Fund warned investors generally before these lawsuits were formally asserted.[19] More significantly, the Fund has retained the

---

[18] To the extent Plaintiffs believe management has abused its fiduciary duties, the law provides ample recourse to them in the appropriate forum. This legal action is not such a forum.

[19] *See* Graham Compl., Ex. 26 (July 3, 2008 investor letter).

assistance of an experienced outside consultant to assist it in managing its defense of claims against it and related costs. *See* Loughlin Decl. ¶¶ 8-12.

In light of Textron's careful monitoring of the Fund's financial condition and the presence of the Fund's third-party advisors, Plaintiffs can demonstrate no irreparable harm to continuance of the status quo as to Fund management. They have not shown a factual basis for the need for the extraordinary judicial intervention of a receiver or that the Court should impose one at the request of a small dissident faction over the express objection of a substantial number of creditors and investors.

      3.    <u>Plaintiffs fail to establish that the balance of equities tips in their favor.</u>

Balancing of harms is a factor properly considered on motion to appoint a receiver. *Versames*, 96 F. Supp. 2d at 365; *see also Winter*, 129 S. Ct. at 374. Because an equity receiver is not a means of preserving assets to satisfy a future judgment, Plaintiffs' Motion is grounded on an improper premise. More significantly, even if they were to prevail in their legal claims, the Fund will not permit them to advance their position ahead of other equity investors. *See* Loughlin Decl. ¶¶ 13-14. Thus a receiver could not help them redirect assets to themselves.

In contrast, an equity receiver potentially could be harmful to the Fund and its creditors and investors. Plaintiffs make no showing as to who the receiver might be, how that person would be selected, how he or she would get paid, or the cost of the receiver's legal and financial advisers. At best, therefore, the Fund would face a period of substantial uncertainty if the Plaintiffs were to prevail on their Motion. In contrast, there is a substantial risk that if a receiver were appointed, such an appointment could place at risk the Fund's current arrangements for access to operating costs with its secured creditors.[20] *See* Quinn Decl. ¶ 36. Further, there is a

---

[20] Plaintiffs' claim that the Fund's agreement with Textron Financial provides for the appointment of a receiver in some circumstances does not tip the balance in favor of appointment here. *See* Mem. at 13-14. The Fund's

significant risk that such an event could cost the Fund the services of Barriger, who remains a critical intermediary with the Fund's creditors and investors, and is a critical witness to the Fund's ability to achieve a successful workout to many of the Fund properties.[21]  *Id.* ¶ 39.

The potential harms to the Fund, its creditors, and to the interests of all the equity investors in the Fund—*including Plaintiffs*—far outweigh any harms Plaintiffs identify.  The Court should not permit Plaintiffs' personal disagreement with the managerial direction of the Fund to jeopardize the substantial interests that could be harmed by the appointment of a receiver.

4.  <u>Plaintiffs fail to show that appointment of a receiver is in the public interest</u>.

A large bloc of investors and creditors oppose the appointment of a receiver here.  For the Court to appoint one in the face of strong opposition at the behest of a small dissident faction is not in the public interest.  To defer to the wishes of a minority faction is contrary to the provisions of corporate governance set forth in the Fund's operating agreement and to Delaware law.  *See* Barriger Opp. Ex. F (2007 LLC) at 17-22; *see Drob v. Nat'l Mem'l Park, Inc.*, 41 A.2d 589, 597 (Del. Ch. 1945) ("Mere dissensions among corporate stockholders, whether over internal matters or otherwise, will seldom justify the appointment of a receiver.").  Only an extraordinary showing of need would permit such a result and the Plaintiffs have not made one.

---

agreement with Textron, regardless of its terms, is of no import to this Motion.  Plaintiffs' invocation of a purported agreement to which they are not parties and whose terms are not before the Court is entirely improper and should be disregarded.

[21]  The Fund's advisor believes that Barriger's participation and cooperation in the Fund's liquidation activities is essential to maximizing the value available for distribution to creditors and equity holders.  Quinn Decl. ¶ 39. Barriger has preexisting positive relationships with Textron Financial and the Fund's other secured creditors making it possible for the Fund to maintain working capital sufficient to sell its properties and collect its debts during wind down.  *Id.* ¶ 36.  Moreover, Barriger has essential knowledge of the facts and historical information necessary to complete the wind down process in an efficient manner.  Bringing a receiver up to speed on these issues would be needlessly expensive and time consuming.  *Id.* ¶ 38.  By way of example, an experienced professional needed four months to become sufficiently familiar with the Fund's multiple investments and operations.  *Id.* ¶ 11.

The Fund is a private equity fund, the risks and nature of which the Plaintiffs understood or should have understood at the time of their investment. *See* MSJ Mem. at 4-10 (discussing risk disclosures in documents). Such private funds are not required to be registered with the Securities and Exchange Commission and they are not subject to public oversight, and thus there is minimal public interest in judicial intervention to protect investors in such enterprises. *Compare In re Worldcom, Inc. Sec. Litig.*, 219 F.R.D. 267, 292 (S.D.N.Y. 2003) (noting the strong public interest in regulation and control of *publicly* traded securities). Absent a showing of widespread theft or rampant fraud—none of which has been shown here—there is little public interest in the extraordinary judicial intervention of the appointment of a receiver for a private equity fund over the objections of its investors.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiffs' Motion to Appoint a Receiver should be denied.

Dated:  February 20, 2009                     Respectfully submitted,

K&L GATES LLP

By: /s/ Richard A. Kirby
    Richard A. Kirby (RK-7674)
    Lisa M. Richman (LR-4927)
K&L GATES LLP
1601 K Street
Washington D.C. 20006-1600
Phone: (202) 778-9000
Fax: (202) 778-9100

*Attorneys for Gaffken & Barriger Fund, LLC*